ATTORNEYS FOR APPELLANT
Michael C. Keating
Yvette M. LaPlante
Keating & LaPlante, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

_____

# In the
# Indiana Supreme Court

FILED
Jun 26 2015, 1:50 pm
CLERK
of the supreme court,
court of appeals and
tax court

_____

No. 63S00-1401-LW-306

ANDREW S. SATTERFIELD,

*Appellant (Defendant),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff).*

_____

Appeal from the Pike Circuit Court, No. 63C01-1112-FB-564
The Honorable Jeffrey L. Biesterveld, Judge

_____

On Direct Appeal from a Sentence of Life Imprisonment Without Parole

_____

**June 26, 2015**

**Rush, Chief Justice.**

Andrew Satterfield brings this direct appeal to challenge his convictions and sentence of life imprisonment without the possibility of parole ("LWOP") for murder and arson. Based on the LWOP sentence, we have mandatory and exclusive jurisdiction over this appeal. Ind. Appellate Rule 4(A)(1)(a). Satterfield presents three issues: that (1) the jury's decision not to find him insane or guilty but mentally ill is contrary to law; (2) the trial court abused its discretion by admitting testimony about his evasiveness during police questioning; and (3) his LWOP sentence is inappropriate under Rule 7(B) based on the nature of the offense and his character. We affirm in all respects.

**Facts and Procedural History**

Satterfield shot his mother, Kathy Satterfield, multiple times at their home in the early hours of December 8, 2011. He first shot her in their kitchen and kept shooting her as she fled into the bathroom. While she lay dying, Satterfield took a gasoline can and poured fuel around the house, locked the doors to the house, and lit it on fire. Satterfield stayed inside the house while it started burning, and he later claimed that his motive for starting the fire was to kill himself. But he changed his mind and decided to flee the house after sustaining serious burns. The fire destroyed much of his clothing; so, after escaping the inferno, he took off all his clothes except his underwear. Then—still wearing only his underwear despite the freezing temperatures—he drove to a gas station, pumped gas, and left without paying. Several hours later, Satterfield sought medical help for his burns at Good Samaritan Hospital in Vincennes, Indiana. But due to the severity of his burns, Good Samaritan Hospital soon transferred Satterfield to Wishard Hospital in Indianapolis. During treatment at each hospital, Satterfield spoke about the murder and fire with multiple detectives. Additional facts will be provided.

The State charged Satterfield with murder, a felony; arson, a class B felony; and attempted arson, a class B felony. Ind. Code §§ 35-42-1-1(1), -43-1-1(a)(1), -41-5-1(a) (2008). Satterfield conceded at trial that he killed his mother and burned down their home. But he defended on grounds he was not responsible by reason of insanity or was guilty but mentally ill. Testimony at trial included three expert witnesses along with lay witness testimony from law enforcement personnel who responded to the fire; nurses who treated Satterfield for his burns; family; and officers and detectives who interviewed him about the murder and fire. The jury found Satterfield guilty on all counts, rather than insane or guilty but mentally ill. The State sought LWOP because the murder occurred while committing arson. I.C. § 35-50-2-9(b)(1)(A). The jury recommended LWOP, and the trial court sentenced Satterfield accordingly. The trial court also merged the two arson convictions and sentenced Satterfield to a concurrent term of 20 years for arson. He appealed directly to this Court pursuant to Indiana Appellate Rule 4(A)(1)(a).

**Discussion and Decision**

**I. The Jury's Rejection of Satterfield's Mental-Health Defenses Was Not Contrary to Law.**

There was conflicting evidence on whether Satterfield was insane or guilty but mentally ill. In these situations, we let juries—not courts—"weigh the evidence and assess witness credibility,"

2

Galloway v. State, 938 N.E.2d 699, 709 (Ind. 2010), and "determine whether the defendant appreciated the wrongfulness of his conduct at the time of the offense" or committed the offense while mentally ill. Myers v. State, 27 N.E.3d 1069, 1075 (Ind. 2015) (insanity); Hurst v. State, 699 N.E.2d 651, 653–54 (Ind. 1998) (guilty but mentally ill). Here, the jury weighed conflicting testimony and found Satterfield guilty. That decision was not contrary to law, and we therefore affirm the verdict.

The jury was instructed on four possible verdicts: "(1) guilty; (2) not guilty; (3) not responsible by reason of insanity at the time of the crime; or (4) guilty but mentally ill at the time of the crime." I.C. § 35-36-2-3. Each verdict is a legal determination, not a medical diagnosis. Defendants are insane when, "as a result of mental disease or defect," they are "unable to appreciate the wrongfulness of th[eir] conduct at the time of the offense." I.C. § 35-41-3-6(a). A "mental disease or defect" means "a severely abnormal mental condition that grossly and demonstrably impairs a person's perception," but not "an abnormality manifested only by repeated unlawful or antisocial conduct." I.C. 35-41-3-6(b). Defendants are guilty but mentally ill if the jury finds they have committed the charged offense while "having a psychiatric disorder which substantially disturbs [their] thinking, feeling, or behavior and impairs [their] ability to function . . . including having any mental retardation." I.C. § 35-36-1-1. Defendants bear the burden to prove insanity or mental illness by a preponderance of the evidence. See I.C. § 35-41-4-1(b); Galloway, 938 N.E.2d at 717.

When a defendant challenges a jury verdict as contrary to law, as Satterfield does here, we grant "substantial deference" to the verdict because "the jury shall have the right to determine the law and the facts" "in all criminal cases." Ind. Const. art. 1, § 19. Because he appeals a negative judgment, Satterfield "faces a heavy burden." Galloway, 938 N.E.2d at 709. "[T]he conviction will only be set aside 'when the evidence is *without conflict* and leads only to the conclusion that the defendant was insane when the crime was committed,'" or guilty but mentally ill. Myers, 27 N.E.3d at 1074–75 (quoting Galloway, 938 N.E.2d at 710); Hurst, 699 N.E.2d at 653 n.4. Accordingly, we "will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact." Myers, 27 N.E.3d at 1074 (quoting Galloway, 938 N.E.2d at 709). Rather, we "will consider only the evidence most favorable to the judgment and the reasonable and logical inferences to be drawn therefrom." Id. at 1075 (quoting Thompson, 804 N.E.2d at 1149).

The jury's right to determine the facts allows jurors to disbelieve expert testimony of a defendant's insanity or mental illness and rely instead on "other sufficient probative evidence from which a conflicting inference of sanity" or mental illness can reasonably be drawn. E.g., Myers, 27 N.E.3d at 1076 (quoting Galloway, 938 N.E.2d at 710); Hurst, 699 N.E.2d at 654. Demeanor evidence, lay opinion testimony, and the circumstances of the crime are just a few examples of the additional evidence that juries may consider and use to either accept or reject expert testimony—even when the expert testimony is unanimous. In Myers, we affirmed a defendant's guilty but mentally ill conviction and rejected his request to find him insane based on testimony "from victims and multiple eyewitnesses describing how the incident unfolded," notwithstanding unanimous expert testimony supporting insanity. 27 N.E.3d at 1076. And in Hurst, we affirmed a guilty-only verdict, rejecting a defendant's appeal for a guilty but mentally ill verdict, when expert testimony conflicted on whether the defendant suffered from a mental illness or was simply under the influence of LSD. 699 N.E.2d at 654.

Here, expert mental-health testimony and other probative evidence conflicted—as to his mental-illness diagnosis of schizophrenia specifically, and as to his sanity generally. Three experts offered conflicting diagnoses to explain Satterfield's mental health, with two finding schizophrenia but one finding his symptoms resulted from drug abuse and jail psychosis instead. Likewise, the evidence for insanity in this case was not compelling because neither of the two court-appointed experts who assessed Satterfield's sanity testified that Satterfield was insane at the time of the offense. Non-expert testimony was similarly inconsistent. It supported the inference that his actions during and after the fire were a product of a mental illness, but could just as easily supported an inference that he was acting deceitfully.

Of the three experts who testified, only two diagnosed schizophrenia: Satterfield's psychiatrist, Dr. Patrick Helfenbein, and court-appointed clinical psychologist Dr. David Cerling. Dr. Helfenbein treated Satterfield for approximately ten years and last saw him in March 2010. He stated with "a hundred percent certainty" that Satterfield was a chronic, paranoid schizophrenic and could not "imagine any other diagnosis that would fit." Several medical reports written by Dr. Helfenbein described Satterfield's symptoms of poverty of speech, flat affect, psychosis, paranoid ideation, and social withdrawal. And Dr. Helfenbein stood by his prior assessments that these symptoms supported a schizophrenia diagnosis. Although Dr. Helfenbein acknowledged that drug

4

use and schizophrenia often go hand-in-hand, he strongly disagreed that drugs could explain Satterfield's symptoms: "I don't think [he's] a pothead—his condition was too intense. The delusions [were] too strong and . . . too consistent . . . to be a pothead."

Dr. Cerling concurred in Dr. Helfenbein's diagnosis. He reviewed Satterfield's past medical records and met with him on two occasions (though he did not review the videos of Satterfield's police interrogations). Dr. Cerling described Satterfield's responses to questioning during one of these interviews, conducted on August 16, 2012, as "just very, very vague, very little there." He also said Satterfield "acknowledge[d] at times hearing voices," and that sometimes the "voices were after him." In summarizing his impressions, Dr. Cerling said, "I was very comfortable with the diagnosis of schizophrenia as being the primary diagnosis that has impaired Mr. Satterfield's being able to function . . . on a day-to-day basis." Dr. Cerling also noted that Satterfield's records referenced substance abuse and acknowledged the "very high incidence between schizophrenics and substance abuse." But he did not believe that "drug use caused his condition."

On the other hand, Dr. Ned Masbaum—a court-appointed forensic psychiatrist who reviewed all of Satterfield's records and conducted a two-hour mental status examination on June 13, 2012— reached a different conclusion. He did not take "issue with [Satterfield's] doctors' past diagnoses," but he "did not see schizophrenia at the time of [his] examination nor did [he] detect any sign of it at the time of the alleged offense." Instead, Dr. Masbaum attributed Satterfield's present symptoms to a personality disorder caused by alcohol and drug dependence, along with "mild to moderate jail psychosis with paranoid features." Dr. Masbaum noted that Satterfield's drug use began at age fifteen or sixteen and included "drugs of the most severe nature," like "crystal methamphetamine." He said that this kind of drug use "affects the brain and can leave a person with hallucinations as well as cause[] physical changes of a severe nature." Dr. Masbaum also described Satterfield's paranoia as a product of his incarceration—jail psychosis—not schizophrenia:

> He said that another inmate had threatened his life, was going to throw him over a banister or things of that nature. And I think he was facing what's commonly called "jailhouse justice." . . . [W]hat that means is people in jail that are alleged to have committed certain crimes against family or other people create a resentment in other inmates who feel they should help the criminal justice system and do something to the person. . . . And, so he was feeling very paranoid.

5

Finally, Dr. Masbaum explained that he believed Satterfield's actions before, during, and after the offense showed "integrated thinking" and "goal-directed behavior"—uncommon characteristics in most schizophrenics. Before the murder, Satterfield was "not truthful regarding questions about psychiatric commitment in the past" when completing a handgun license application, despite his years of psychiatric treatment. And additional signs of "integrated thinking" were present "at the time of the alleged offense and immediately afterwards." Dr. Masbaum elaborated that

> [h]e's able to understand he needs medical care. He's able to get in his car and he has his own driver's license. He was able to obtain a driver's license. . . . He's able to proceed with goal-directed behavior in his car to get medical care. He's also able to think through that he has to do this deceptively otherwise the police are going to be involved. And when he gets to the hospital, he does not tell the hospital personnel initially . . . all the circumstances of his burns. Again, he's thinking to escape the police because he knows he'll be reported to the police. . . . It's not a disordered thought. It's a thought of manipulation and deception. . . . It's not characteristic of schizophrenia.

And even apart from the conflicting expert evidence on Satterfield's mental illness, there was also no consensus on his insanity. Neither of the two experts appointed by the trial court to assess Satterfield's sanity—Dr. Cerling and Dr. Masbaum—testified Satterfield was insane at the time of the offense. Dr. Cerling testified only that he "lean[ed] towards" finding Satterfield insane, and was at least 75% sure. This assessment was not decisive, and Dr. Masbaum testified that Satterfield was sane:

> He was able to appreciate the wrongfulness of his conduct at [the] time [of the offense]. He did not call local emergency responders for fear that it would bring the sheriff. He fled the crime scene. He sought medical help after leaving the crime scene then attempted concealment of the crime by not revealing circumstances of the burns immediately to the staff. And, of course, the fire itself is the way of destroying evidence at a crime scene.

Dr. Helfenbein gave no opinion because he was not qualified to comment on Satterfield's sanity. The jury was well within its bounds to reject Satterfield's insanity defense when none of the expert witnesses were willing to embrace that defense either.

The jury also heard conflicting non-expert testimony of Defendant's sanity and mental illness. Satterfield left several pieces of incriminating evidence at the scene of the crime, including

6

his wallet and clothes; he then pumped gasoline in only his underwear despite freezing temperatures and remained unclad when he arrived at the hospital; he failed to seek immediate medical attention to address his severe burns; and when he was treated, he did not show many signs of pain. Defense counsel argued that a sane and mentally healthy person would not have have acted so bizzarely. But other evidence suggested those actions stemmed from deceit, not mental illness. Satterfield had told one expert witness during an interview that he did not call emergency help after the fire because he did not want police to come. At Wishard Hospital, Satterfield claimed he shot his mother because she was coming after him. But in a psychiatric evaluation with one of the court-appointed forensic psychiatrists, he said that he shot her because he did not know how to deal with her worsening health problems. And when he sought a handgun license in May 2010, he did not disclose his prior psychiatric commitment. (The form asked "Have you ever been treated for psychiatric health care or an emotional or mental illness?" Satterfield checked the box next to "No.") But he admitted that he gets Social Security disability benefits because of his schizophrenia diagnosis. As Dr. Masbaum previously noted, Satterfield knew how to use his illness to his advantage.

In view of the disputed evidence—both expert and non-expert—taken as a whole, we cannot say the evidence is without conflict on both Satterfield's insanity and mental illness, and so we affirm the jury's verdict as not contrary to law. Galloway, 938 N.E.2d at 710. The jury heard all this conflicting evidence, weighed it as it deemed best, and rendered a guilty verdict. We give substantial deference to its verdict and thus affirm its decision.

## II. The Trial Court Did Not Abuse Its Discretion in Admitting Testimony About Satterfield's Evasiveness Because It Was Admissible as Lay Opinion Testimony.

At trial, Satterfield objected to a detective's characterization of the answers he gave during a police interview as "evasive." Detective Tobias Odom conducted the interview while Satterfield was recovering from his injuries at Wishard Hospital, and he video-recorded their conversation. The State played the entire video at trial. After the video ended, Detective Odom discussed Satterfield's behavior during the interview:

> STATE: How would you characterize the answers Mr. Satterfield
> was giving to the questions you were asking?
> ODOM: At times he minimizes his involvement. Maximizes other
> things.

> STATE: When you say he minimizes, what does that mean?
> ODOM: We all tend to minimize our—our involvement at times.
> STATE: We tend to—to play down the things that make us look bad?
> ODOM: Correct.
> STATE: And when you say, he maximized, what do you mean?
> ODOM: Long answers. Going over the same thing he spoke about when you're not really asking that question.
> STATE: Those things which would—tends to create sympathy, or support a certain conclusion? . . . By maximizing, do [you] mean long, drawn-out answers about the things that we tend to—to—give us sympathy or support a beneficial conclusion?
> ODOM: Could be. Or—or, just not answering the question at hand. You just move—keep moving over the same things over and over again.
> STATE: In that sense, would you characterize the answers as *evasive*?
> ODOM: Yes. Can be.

(Emphasis added.) The trial court admitted Detective Odom's testimony over Satterfield's objection as skilled witness testimony.

Satterfield now argues that the trial court abused its discretion in admitting this testimony for two reasons: (1) Detective Odom was not qualified as a skilled witness to determine evasiveness in an interview under Indiana Rule of Evidence 701; and (2) even if he was, Detective Odom may not offer "human lie detector" testimony about his truthfulness in the interview. Satterfield further contends that this error was not harmless because his behavior and mental state were critical to his insanity defense.

Trial courts have broad discretion to admit or exclude evidence, and our review is limited to whether the trial court abused that discretion. Blount v. State, 22 N.E.3d 559, 564 (Ind. 2014). We consider all the facts and circumstances surrounding the trial court's decision to determine whether it is "clearly against the logic and effect" of what those facts and circumstances dictate. Id. And we "may affirm a trial court's judgment on any theory supported by the evidence." Clark v. State, 808 N.E.2d 1183, 1188 (Ind. 2004).

Applying that standard here, we find Detective Odom's testimony was neither a skilled-witness opinion (though that's what the trial court called it), nor forbidden "human lie detector"

testimony. Rather, we hold it admissible as lay opinion testimony—a helpful summary of observations any ordinary juror could have made while listening to Satterfield's responses. We therefore affirm the trial court's discretion on that alternative basis.

### A. *Detective Odom's Testimony Was Lay Opinion Testimony, Not Skilled Witness Testimony.*

Helpful opinions are not exclusive to experts or skilled witnesses. Any witness "not testifying as an expert"—whether an ordinary lay witness or a skilled witness—may testify "in the form of an opinion" if it is "(a) rationally based on the perception of the witness and (b) *helpful to a clear understanding of the witness's testimony or determination of a fact in issue*." Ind. Evidence Rule 701 (emphasis added). "The requirement that the opinion be 'rationally based' on perception simply means that the opinion must be one that a reasonable person could normally form from the perceived facts," Davis v. State, 791 N.E.2d 266, 268 (Ind. Ct. App. 2003), trans. denied, which are facts received "directly through any of the [witness's own] senses," Ashworth v. State, 901 N.E.2d 567, 572 (Ind. Ct. App. 2009) (quoting Kubsch v. State, 784 N.E.2d 905, 922 (Ind. 2003) (defining "perception" under Evidence Rule 701)), trans. denied. And the witness's opinion is "helpful" "if the testimony gives substance to facts, which were difficult to articulate." McCutchan v. Blanck, 846 N.E.2d 256, 262 (Ind. Ct. App. 2006).

The premise of Satterfield's first argument is that only a skilled witness may testify that a person is being "evasive." The difference between skilled witnesses and ordinary lay witnesses is their degree of knowledge concerning the subject of their testimony. Neither has the "scientific, technical, or other specialized knowledge" of experts, Evid. R. 702(a), and both ordinary lay and skilled witnesses testify from their perceptions alone, not necessarily established scientific principles, id. Skilled witnesses, though, possess knowledge beyond that of the average juror. Kubsch, 784 N.E.2d at 922. This additional knowledge allows a skilled witness to perceive more information from the same set of facts and circumstances than an unskilled witness would. All opinion testimony is helpful, "giv[ing] substance to facts, which [are] difficult to articulate." McCutchan, 846 N.E.2d at 262. But skilled witness testimony is helpful because it involves conclusions that escape the average observer.

Here, however, the opinion offered by Detective Odom concerning the content of Satterfield's interview questions was no more insightful than what an ordinary lay witness could have observed—it was simply a helpful, tangible summary to articulate his intangible observations. Our

9

Court of Appeals decision in Tolliver v. State, 922 N.E.2d 1272 (Ind. Ct. App. 2010), trans. denied, illustrates this situation well. There, a law enforcement officer interviewed a gunshot victim at a hospital as he was recovering from wounds inflicted by the defendant. At trial the officer was asked about the victim's "mannerisms or behaviors" at the hospital. The officer "testified that [the victim], while lying on the stretcher, had rolled away from him, that [he] became angry and said he was not a 'snitch' and would 'handle it himself,' and that [the victim] was 'kind of closed up,' and uncooperative and did not want to have anything to do with speaking to [the] [o]fficer." Id. at 1279. The Court of Appeals held that this was not skilled witness testimony because "any lay witness might have observed . . . that [the victim] was 'uncooperative' based upon" the behavior described by the officer. Id. "Such a commonsense conclusion did not require a 'skilled witness' foundation and would have been admissible pursuant to Rule 701 as a lay opinion rationally based upon perception and helpful to a clear understanding of the facts of the case." Id.

Similar to the situation in Tolliver, the State asked Detective Odom to characterize Satterfield's responses, and he said that Satterfield failed to answer questions, minimized incriminating information, and maximized harmless information. In this context, the term "evasive" was helpful as a summary of the content and manner of answering questions and nothing more. And he did not overstate his summary—the State was the only party to actually use the word "evasive," and Detective Odom simply responded with, "Yes. Can be." This was a "commonsense conclusion," and "any lay witness might have observed" Satterfield's behavior and reached the same opinion. Id. at 1279. If anything, Detective Odom's insight was simply helpful—cogently distilling the inconsistency of Satterfield's answers to a single word, and thereby "giv[ing] substance to facts, which were difficult to articulate." McCutchan, 846 N.E.2d at 262. But helpful though it was, the testimony was still the fruit of lay observation, not specialized knowledge. The trial court, therefore, did misidentify Detective Odom's testimony as skilled witness testimony. But because we find it admissible as lay opinion testimony, we affirm the trial court's decision on that alternative basis. Clark, 808 N.E.2d at 1188.

Our own review of the video played at trial confirms just as much. K.W. v. State, 984 N.E.2d 610, 613 n.1 (Ind. 2013) (reviewing sufficiency of the evidence of criminal charge in light of a video of a police officer describing defendant's conduct during the offense). The video shows Satterfield answering questions unrelated to the shooting (including the arson) in a calm and coherent manner, and it shows him being hesitant and halting when answering questions related to

the shooting. Detective Odom's characterization of Satterfield's alternatively minimizing and maximizing answers as "evasive" is an accurate and helpful summary of our own observations.

### B. Detective Odom's Testimony Was Not "Human Lie Detector" Testimony.

This testimony offered by Detective Odom was also not "human lie detector" testimony when understood in the context of his entire testimony and the video itself. No witness may "testify to opinions concerning intent, guilt, or innocence in a criminal case [or] . . . whether a witness has testified truthfully." Evid. R. 704(b). Taken alone, the word "evasive" can mean "tending or seeking to evade; not straightforward; tricky. . . ," Webster's New World Dictionary (Third College Edition) 470 (1998), and "evade" can mean "to be deceitful or clever in avoiding or escaping something." Id. These definitions could imply an intent to deceive. But "evasive" can also mean "equivocal," without a mendacious intent. Id. And taken in the context of Detective Odom's entire testimony and the video of the interview, Detective Odom's summary of Satterfield's mode of answering questions—namely, minimizing incriminating information, and maximizing harmless information—was not a statement of his veracity. We acknowledge the trial court mischaracterized Detective Odom's testimony as skilled witness testimony. But the trial court made no comment about Detective Odom's ability to identify untruthfulness—as the trial court in Tolliver had mistakenly done. Thus, Detective Odom did not serve as a "human lie detector."[1]

In sum, Detective Odom was not an unqualified skilled witness, nor was his testimony inadmissible commentary on Satterfield's truthfulness. Rather, in the context of Detective Odom's entire testimony and in light of our own observations of the video itself, the testimony was admissible as a helpful, "commonsense conclusion" about Satterfield's manner of answering questions during an interview. Because we find that the trial court did not abuse its discretion, we need not conduct harmless error review.

---

[1] We reach this conclusion mindful that, under different facts and circumstances, use of the term "evasive" may amount to commentary on a witness's veracity. We also recognize that demeanor testimony, in general, raises additional concerns for defendants who suffer from schizophrenia. We said in Galloway that "demeanor evidence is of more limited value when the defendant has a long history of mental illness with psychosis," like schizophrenia. 938 N.E.2d at 713. Our rationale was that individuals who are truly psychotic will often appear quite normal to everyday bystanders before and after the alleged offense—based on the intermittent nature of hallucinations and delusions. Id. at 713–14. But the record, taken as a whole, and our own review of the interrogation video prove that Detective Odom's use of the term "evasive" did not trigger such concerns in this case.

11

**III.    Satterfield's LWOP Sentence Was Not Inappropriate.**

Lastly, Satterfield argues his LWOP sentence was inappropriate. Under Appellate Rule 7(B), we have discretion to revise a sentence authorized by statute if, "after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." This review effectuates our authority to "review and revise sentences under Article 7, section 4 of the Indiana Constitution." Knapp v. State, 9 N.E.3d 1274, 1292 (Ind. 2014). We independently examine the nature of Satterfield's offenses and his character under Rule 7(B) with substantial deference to the trial court's sentence. Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008). Our job is not to determine the "correct" sentence, but to "leaven the outliers" to ensure that our trial courts are sentencing defendants appropriately. Id.

We conclude that Satterfield has not carried his burden to show that the nature of his offense or his character warrants a reduced sentence. See Conley v. State, 972 N.E.2d 864, 876 (Ind. 2012). Satterfield brutally murdered his own mother, in their home, the day after her birthday. He shot her multiple times while she ran away from him. She ultimately bled to death on a bathroom floor. While she was dying, Satterfield poured gasoline around the home and lit it on fire. Although LWOP is the second most severe penalty a court may enter, the brutal nature of Satterfield's offenses does not justify a mitigated sentence.

His character similarly does not warrant a reduced sentence. After murdering his mother and burning down their home, he fled the area without calling the fire department for fear of contact with law enforcement. When Satterfield arrived at Good Samaritan Hospital, he was uncooperative with hospital staff who sought to learn the cause of his injuries. Only after the police discovered Satterfield's involvement with the fire did he finally cooperate. Satterfield's attempt to avoid culpability for his mother's murder is consistent with a pattern of deception that precedes his crimes. He knew how to use his diagnoses for mental illness to his advantage—omitting them when he applied for a handgun license, which likely would have doomed his application, but disclosing them when he sought disability benefits.

Additional aspects of Satterfield's character are likewise troubling. Although medical experts debated the extent of Satterfield's alcohol and drug use, Satterfield admitted to abusing illegal drugs for years. His history of substance abuse includes marijuana, prescription drugs, inhalants, alcohol,

and methamphetamine. Satterfield does not have a history of violent crime, but he still has a criminal history: He pleaded guilty to operating a vehicle with a BAC of at least 0.10 and has been charged with minor consumption, furnishing alcohol to a minor, another count of operating a vehicle while intoxicated, providing false information on a handgun license application, using false information to obtain a firearm, and two counts of perjury. He was also adjudicated delinquent as a juvenile. Taking these facts together, Satterfield's character does not persuade us that his sentence was inappropriate.

Although Satterfield asks this Court to reduce his sentence in light of his mental illness, we decline this invitation. The jury did not find him mentally ill. And Satterfield fails to cite any case in which we have reduced a LWOP sentence under Rule 7(B) for reasons of mental illness. Moreover, the trial court ordered his mental health records forwarded to the DOC, which tells us that his mental health status will be acknowledged while in prison. In sum, Satterfield's sentence was not inappropriate given the violent nature of this crime and his troubled character.

**Conclusion**

The jury's rejection of Satterfield's mental health defenses was not contrary to law because the evidence was not without conflict on his mental illness or sanity. We also hold that police detective testimony that Satterfield was "evasive" during an interview was admissible lay opinion testimony when understood in the broader context of the detective's description of Satterfield's behavior during the interview. And this testimony was not an impermissible comment on Satterfield's truthfulness. Finally, there is no basis on which to find his LWOP sentence inappropriate under Rule 7(B) based on the nature of his offense and character. Accordingly, we affirm Satterfield's convictions and sentence.

Dickson, Rucker, David, and Massa, JJ., concur.

13