## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 13 2017, 9:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jonathan D. Harwell
Harwell Legal Counsel LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Chase E. Mourey, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 13, 2017

Court of Appeals Case No.
41A05-1703-CR-461

Appeal from the
Johnson Circuit Court

The Honorable
K. Mark Loyd, Judge

Trial Court Cause No.
41C01-1510-F6-455

**Kirsch, Judge.**

[1] Following a jury trial, Chase E. Mourey, Jr. ("Mourey") was convicted of Level 6 felony assisting a criminal.[1]  He raises two issues on appeal, which we restate as:

> I.  Whether the State presented sufficient evidence to convict him; and

> II.  Whether his sentence is inappropriate in light of the nature of the offense and the character of the offender.

[2] We affirm.

## Facts and Procedural History

[3] At around 10:30 a.m. on October 22, 2015, deputies from Johnson County Sheriff's Department and an investigator with the Johnson County Prosecutor's Office went to a mobile home park to locate and serve a warrant on Justin Delk ("Delk"), who was wanted for felony non-support of a dependent child.  The deputies had received information that he might be in the residence of a woman named Kara Harter ("Harter"), who was married to Mourey, although the two had been separated for a year or more at that time.

[4] Upon arrival at Harter's residence, deputies observed a vehicle in the driveway that matched the description of Delk's vehicle.  Deputy Charles Murphy ("Deputy Murphy") knocked loudly on the door, and although no one

---

[1] *See* Ind. Code § 35-44.1-2-5(a)(1).

answered, deputies heard "a loud crashing noise," which sounded like "crashing furniture," inside. *Tr. Vol. I* at 166. Deputies made contact with Harter by phone, and, thereafter, she and Mourey answered the door and stepped out. Deputies explained that they were there looking for Delk, and they presented a search warrant to Harter. The warrant did not reflect the correct address for Harter's residence, and Harter and Mourey requested a corrected warrant before they would allow entry.

[5] In the course of the conversation, Mourey and Harter acknowledged that they knew Delk, but said he was not in the residence. Mourey told Deputy Murphy that they had not seen Delk "in several months," but because deputies had seen a picture "that hadn't been taken long ago" of Mourey and Delk in a vehicle together, they believed Mourey was lying. *Id*. at 167-68. Mourey repeatedly denied that Delk was inside Harter's residence.

[6] As deputies were waiting for the hard copy of the amended warrant to be brought to the scene, they again knocked, and Mourey and Harter came out. Deputies told them that the warrant had been changed, and "If [Delk] is in there . . . [j]ust have him come outside[,]" and they urged, "[I]t's not worth going to jail over a friend[.]" *Id.* at 169. Mourey was "adamant" that Delk was not inside. *Id*.

[7] At some point before the warrant arrived, Mourey opened the door, came outside, and said he "was tired of [deputies] being around" the residence, at which time the deputies were allowed to enter. *Id*. at 170. Deputy Murphy

suggested, "[I]f he's in here, please, just let us know[,]" and "[I]t's not worth anybody getting hurt over it." *Id.* at 171. Mourey again stated that Delk was not there. Eventually, Delk was found hiding under a bed in one of the children's bedrooms. Shortly after Delk was apprehended, Mourey made a statement to the effect that Delk was his friend and "what else am I supposed to do." *Id.* at 220, 224; *Tr. Vol. II* at 18. Before he was taken to jail, Delk put on his shoes, which were near the front door.

[8] The State charged Mourey with Level 6 felony assisting a criminal. At the jury trial, Deputy Murphy described that, while he was talking to Mourey and Harter, and as they were denying that Delk was inside, Mourey appeared "really nervous," did not make eye contact, and his "voice was cracking." *Tr. Vol. I* at 168. Deputy Murphy stated that once he and other deputies were in the residence, which he described as being "in complete disarray[,]" with "clutter, clothes, trash laying everywhere," he looked into one bedroom and saw that the bed was "perfectly made" and stuffed animals were placed on it, which he found "odd," given the state of the rest of the home. *Id.* at 172, 174. He then noticed that the bed was "kind of off the ground" and that dresser drawers were placed under the bed, which raised the deputies' suspicions that Delk was under the bed. *Id.* at 174. The deputies pulled up the mattress and found Delk. Deputy Murphy said that, when he brought out Delk from the bedroom, Mourey did not have any reaction, "He wasn't shocked like, oh, my God, I didn't know you were in there. He just sat there and looked defeated." *Id.* at 177.

[9] Lieutenant Perry Wilson ("Lieutenant Wilson") testified to entering the home and waiting inside the front door, with the occupants, while Deputy Murphy and another deputy entered a bedroom and came out with Delk. Lieutenant Wilson testified that Mourey was not surprised, he seemed apologetic, and he uttered a statement the gist of which was "[H]e's my friend, what else am I supposed to do." *Id.* at 220, 224; *Tr. Vol. II* at 18. At the conclusion of the State's evidence, Mourey made a motion for a directed verdict, which the trial court denied.

[10] Mourey testified that the lease of the residence was in Harter's name, and he had no property interest in it. He testified that, although he and Harter were separated, he went to her residence two or three times per week on weekdays to assist Harter, who was legally blind, with getting the children ready for school. He testified that on the day in question he arrived at the home at about 6:00 a.m., and, upon arrival, he went to the bedroom, watched television, fell asleep and remained asleep for several hours until deputies called.[2] *Tr. Vol. I* at 247. He did not wake up to or hear any large crashing sound. Mourey stated that Delk's shoes were not by the door when Mourey arrived at 6 a.m. and that he did not notice them there when he was talking to deputies at the door on several occasions.

---

[2] Mourey stated that the children did not attend school that day, and he believed it was fall break.

[11] Mourey testified that Delk had been helping with a bathroom remodeling job for the last several weeks and that Mourey expected Delk to arrive at 10:00 or 11:00 a.m. When Mourey was asked if Delk was at the residence when he arrived at 6:00 a.m., Mourey said no. He also stated that, when deputies were asking him if Delk was in the home, he was unaware of Delk's presence. When he was asked if any of the children told him that Delk was inside, Mourey replied, "Not that I can remember." *Tr. Vol. II* at 5. Mourey stated that his sister-in-law owned a vehicle of the same make and model as Delk's, and it was in the driveway.

[12] The jury found Mourey guilty as charged. At sentencing, the trial court found that Mourey's criminal history was an aggravator and the undue hardship on his dependents was a mitigator. The trial court sentenced Mourey to 910 days, of which 545 days was to be served on home detention and 365 days were suspended to probation. *Appellant's App. Vol. II* at 54; *Tr. Vol. II* at 86-88. Following the denial of his motion to correct error, Mourey now appeals.

## Discussion and Decision

## I. Sufficiency of the Evidence

[13] Mourey asserts that the State failed to present sufficient evidence to convict him. In reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. *Jones v. State*, 22 N.E.3d 877, 879 (Ind. Ct. App. 2014). Instead, we consider only the evidence supporting the conviction and the reasonable inferences to be drawn therefrom.

*Id.* If there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt, then the judgment will not be disturbed. *Id.* It is not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference may reasonably be drawn from it to support the conviction. *Drane v. State,* 867 N.E.2d 144, 147 (Ind. 2007). Accordingly, the question on appeal is whether the inferences supporting the verdict were reasonable, not whether other, "more reasonable" inferences could have been drawn. *Thompson v. State,* 804 N.E.2d 1146, 1150 (Ind. 2004). Because reaching alternative inferences is the function of the trier of fact, we may not reverse a conviction merely because a different inference might plausibly be drawn from the evidence. *Id.*

[14] Indiana Code section 35-44.1-2-5, criminalizing assisting a criminal, provides in relevant part:

> (a) A person not standing in the relation of parent, child, or spouse to another person who has committed a crime or is a fugitive from justice who, with intent to hinder the apprehension or punishment of the other person, harbors, conceals, or otherwise assists the person commits assisting a criminal, a Class A misdemeanor. However, the offense is:
>
> (1) a Level 6 felony, if:
>
> (A) the person assisted has committed a Class B, Class C, or Class D felony before July 1, 2014, or a Level 3, Level 4, Level 5, or Level 6 felony after June 30, 2014[.]

Here, to convict Mourey as charged, the State was required to prove that he harbored, concealed, or assisted Delk, who had committed Class D felony nonsupport of a dependent, with the intent to hinder the apprehension of Delk.

[15] Mourey's primary claim is that there was insufficient evidence that Mourey knew of Delk's presence in the home. He relies on his testimony that he denied knowledge of Delk's whereabouts and that he had been asleep for at least two hours before deputies arrived, noting that no evidence was presented concerning how long Delk was at the residence. The State asserts, however, that sufficient evidence was presented from which the jury could have inferred that Mourey knew Delk was in the residence. We agree.

[16] Mourey testified that he regularly came to Harter's home to help get their kids ready for school, but on the day in question, they did not have school, and he fell asleep shortly after he arrived. Deputy Murphy testified that Mourey appeared nervous when the deputies were asking whether Delk was in the residence. Mourey told deputies that he had not seen Delk in several months, which deputies suspected was false, because they had seen a picture "that hadn't been taken long ago" of Mourey with Delk in a vehicle. *Tr. Vol. I* at 168. Deputies heard a loud commotion inside the house resembling the sound of crashing furniture after they knocked, but Mourey claimed to not have heard any commotion inside the residence which was, at most, 1000 square feet. A vehicle matching the description of Delk's was in the driveway when deputies arrived around 10:30 a.m., as well as when Mourey arrived at 6:00 a.m. Delk's shoes were inside the house and near the front door, where Mourey entered and

exited several times when speaking with deputies. Mourey testified that he had expected Delk to arrive between 10:00 and 11:00 a.m., but he acknowledged on cross-examination that he did not mention this information to deputies when they arrived around 10:30 a.m. and repeatedly asked him if Delk was in the home.

[17]     Also, the evidence was that Mourey and Delk had been friends for four or five years, and when Delk was apprehended, Mourey did not appear surprised; rather, he seemed "defeated." *Id.* at 177. Lieutenant Wilson heard Mourey make a comment that Delk was his friend and "what else was I supposed to do." *Id.* at 220, 224, *Tr. Vol. II* at 18. The State argues, and we agree, that from the evidence presented, the jury could have inferred that Mourey knew that Delk was in the home, and he felt, as a friend, he should lie to deputies to cover up for his friend.

[18]     In support of his argument that the evidence was insufficient, Mourey relies on *Taylor v. State*, 445 N.E.2d 1025, 1026 (Ind. Ct. App. 1983), where police came to serve a warrant on an individual named Louis Jordan ("Jordan"), and Taylor told officers that she did not know Jordan or his whereabouts. Officers later found Jordan in a storage trunk in the living room of the home. *Id.* The *Taylor* court reversed Taylor's conviction for assisting a criminal on the basis that it was unreasonable under the circumstances for the fact-finder "to infer knowledge of Jordan's presence within the residence without other indicia of knowledge." *Id.* at 1027. In doing so, the court outlined a list of examples of such indicia, including: (1) length of time the defendant and fugitive were

within the dwelling before the officer's presence was known; (2) the place the fugitive was hidden; (3) the fugitive's secretion in a room where his presence and activity were available to defendant's senses of sight or sound; (4) the existence of a relationship between or among the parties; (5) the reasons the police officers had for going to the house where the fugitive was found; (6) the length of time the dwelling was under surveillance by the law enforcement authorities; or (7) the physical layout of the house. *Id*. at 1027.

[19] We consider *Taylor*, but do not find that it controls our decision today or demands a reversal of Mourey's conviction. First, the *Taylor* court's list of factors to consider was non-exhaustive. *Id.* ("This listing is not exhaustive but merely illustrative."). Second, evidence was presented in the current case from which the jury could have inferred that Mourey knew that Delk was in the home and opted not to tell deputies. Based on the record before us, we conclude that the State presented sufficient evidence to sustain Mourey's conviction for Level 6 felony assisting a criminal.

## II. Sentencing

[20] The trial court sentenced Mourey to a total sentence of 910 days with 535 served on home detention and 365 days on probation. *Appellant's App*. at 54-57; *Tr. Vol. II* at 87. Mourey claims that the trial court "inappropriately sentenced [him] to the maximum sentence." *Appellant's Br*. at 10. Pursuant to Indiana Appellate Rule 7(B), this Court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the

sentence is inappropriate in light of the nature of the offense and the character of the offender." Our supreme court has explained that the principal role of appellate review should be to attempt to leaven the outliers, "not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). We independently examine the nature of Mourey's offense and his character under Appellate Rule 7(B) with substantial deference to the trial court's sentence. *Satterfield v. State*, 33 N.E.3d 344, 355 (Ind. 2015).

[21] "In conducting our review, we do not look to see whether the defendant's sentence is appropriate or if another sentence might be *more* appropriate; rather, the test is whether the sentence is 'inappropriate.'" *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied*. "In assessing whether a sentence is inappropriate, appellate courts may take into account whether a portion of the sentence is ordered suspended or is otherwise crafted using any of the variety of sentencing tools available to the trial judge." *McFall v. State*, 71 N.E.3d 383, 390 (Ind. Ct. App. 2017). Mourey bears the burden of persuading us that his sentence is inappropriate.

[22] "As to the nature of the offense, the advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed." *Kunberger v. State*, 46 N.E.3d 966, 973 (Ind. Ct. App. 2015). The advisory sentence for Mourey's Level 6 felony conviction is one year, with a range of between six months and two and a half years. Ind. Code § 35-50-2-7(b). Although Mourey claims his sentence was the maximum, this court has explained, "[A] maximum sentence is not just a sentence of maximum length,

but a fully executed sentence of maximum length" and that "[a]nything less harsh, be it placement in community corrections, probation, or any other available alternative to prison, is simply not a maximum sentence." *Jenkins v. State*, 909 N.E.2d 1080, 1085-86 (Ind. Ct. App. 2009), *trans. denied*.

[23] The nature of the offense is found in the details and circumstances of the commission of the offense and the defendant's participation. *Croy v. State*, 953 N.E.2d 660, 664 (Ind. Ct. App. 2011). Mourey argues that the nature of his offense was non-violent and that Delk was not wanted for a violent offense, suggesting that "there was no evidence [] of Mourey or Delk being of a violent character or presenting a known danger to officers." *Appellant*'s *Br*. at 11. However, as Deputy Murphy testified, serving warrants is a dangerous undertaking for law enforcement and that, sometimes, situations escalate and suspects become scared and take a "fight-or-flight" approach, either trying to run or fighting with law enforcement. *Tr. Vol. I* at 162-63. Here, deputies had information that Delk was in Harter's residence, and they went there to serve the felony warrant on Delk. Deputies asked multiple times whether Delk was present, and in fact "pleaded" with Mourey to just send Delk outside, but, instead, Mourey steadfastly denied having any knowledge that Delk was at the premises. *Id.* at 173.

[24] "The character of the offender is found in what we learn of the offender's life and conduct." *Croy*, 953 N.E.2d at 664. Mourey argues that evidence was presented that he is the sole breadwinner for the family, has been employed for many years, and that the letters submitted to the trial court showed that he is

"an individual that is a positive member of the community and a family man."
*Appellant's Br.* at 11. However, the record before us reflects that Mourey has a criminal history, including felony convictions for possession of methamphetamine, non-support of a dependent child, and theft. *Appellant's App. Vol. II* at 20-22. He also has at least four misdemeanor convictions and was charged with misdemeanor theft while the current case was pending. *Id.* His prior participation in community corrections was revoked. We cannot say that his character warrants revision of his sentence.

[25] In reviewing a sentence, Indiana courts may consider all aspects of the penal consequences found in a trial court's sentence, including whether it consists of executed time, probation, suspension, home detention, or placement in community corrections, and whether the sentences run concurrently or consecutively. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010). Here, Mourey's sentence was 910 days, of which 535 days were to be served on home detention and 365 days were suspended to probation. Mourey has failed to carry his burden of establishing that his sentence is inappropriate in light of the nature of the offense and his character.

[26] Affirmed.

Najam, J., and Brown, J., concur.