## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 14 2018, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Linda Sechrest,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 14, 2018

Court of Appeals Case No.
18A-CR-628

Appeal from the
Ripley Circuit Court

The Honorable
Ryan J. King, Judge

Trial Court Cause No.
69C01-1608-F3-14

**Kirsch, Judge.**

[1] Linda Sechrest ("Sechrest") pleaded guilty to Level 3 felony conspiracy to manufacture methamphetamine and was sentenced to twelve years in the

Indiana Department of Correction ("the DOC"), with six of those years suspended to probation. Sechrest appeals her sentence and raises the following issue for our review: whether her sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## Facts and Procedural History

As early as November 2015, Sechrest was involved in a methamphetamine production operation. By all accounts, her husband, Eric ("Eric"), was the ringleader, and Sechrest assisted him. The drug operation involved a number of other individuals, including (1) her adult daughter, Gabrielle ("Gabrielle"), (2) Gabrielle's boyfriend or husband, Isaac Burkett ("Isaac"), who also goes by the name "Lumpy," (3) Sechrest's teenage son ("C.S."), (4) and friends, including D.J. Johns ("Johns"). At first, Sechrest and her husband were living in an apartment, and the methamphetamine was being produced there, but they later moved to a trailer, where the production continued. At times, living in the trailer were Sechrest, Eric, C.S., Gabrielle, Isaac, their minor son ("Child"), Johns, and someone named Chris Gallagher, along with his girlfriend and their two young children. Eric would tell Sechrest that they needed pseudoephedrine and other precursors, and Sechrest would ask, among others, Johns and Gabrielle, and Isaac to purchase the items. Eric would manufacture the methamphetamine, and he primarily was the one who sold it. Following sales of the methamphetamine, Eric would give money to Sechrest.

[4] In March 2016, Eric was jailed for a month or so on an unrelated probation violation, and while he was in jail, Eric communicated via telephone with Sechrest and instructed her to have others purchase Sudafed or pseudoephedrine products, saying to her, "You need to go ahead and have everybody get their squares, so that I can get to work when I get out of here[,]" and "Have Lumpy and everybody all go get them[.]" *Appellant's App. Vol. II* at 11-12. Eric told Sechrest, "It would be awesome if I had about twenty or thirty of em when I get out of here." *Id*. at 12; *Tr. Vol. II* at 87. Sechrest did as she was asked, and she kept the operation running in Eric's absence. Meanwhile, law enforcement personnel were listening to recordings of Eric's jail telephone calls with Sechrest, and they engaged in an investigation of what authorities believed was a methamphetamine producing business.

[5] Following the investigation and execution of a search warrant at Sechrest's residence, the State charged Sechrest in August 2016 with Level 3 felony conspiracy to manufacture methamphetamine, alleging as follows:

> On or between March 31, 2016 and July 28, 2016 in Ripley County, State of Indiana, Linda Sechrest agreed with Eric Sechrest or Gabrielle Sechrest or Isaac Burkett or DJ Johns to knowingly or intentionally manufacture methamphetamine in an amount at least five (5) grams but less than ten (10) grams. Eric Sechrest or Linda Sechrest or Gabrielle Sechrest or Isaac Burkett or DJ Johns performed an overt act in furtherance of that agreement.

*Appellant's App. Vol. II* at 9.

On February 13, 2018, Sechrest pleaded guilty as charged and sentencing was left to the trial court's discretion.[1] That same date, the trial court held a sentencing hearing. At the hearing, the State called as a witness Johns, who stated that his first contact with the Sechrest family and with methamphetamine was in November 2015, when he met Sechrest and her daughter Gabrielle. They asked Johns to purchase Sudafed, and in exchange, the Sechrests would give him money or methamphetamine. Johns said, "I chose to get meth." *Tr. Vol. II* at 13. Johns said that Eric would cook the pseudoephedrine, sometimes at the apartment where the Sechrests lived at the time. After the apartment, the Sechrests moved to a trailer and continued their production of methamphetamine there. He said that Eric, Sechrest, Isaac, and Donald Bentle would "would ask people to go and buy" the ingredients, including "boxes" of pseudoephedrine. *Id*. at 13-14, 18. Johns testified that Sechrest asked him to do so on approximately five occasions. *Id.* at 18-19. He estimated that "at least twenty" people were involved in the process. *Id*. at 14. Johns testified that he never saw Sechrest use methamphetamine and only saw her sell it on one occasion, but he saw Eric hand cash directly to Sechrest on three occasions, when he happened to be present, following Eric making a sale of methamphetamine. *Id*. at 19, 25.

---

[1] The guilty plea agreement is not included in the record before us. However, the parties agree and the transcript of the sentencing hearing reflects that it was an "open plea." *Tr. Vol. II* at 3.

[7] Johns also testified about a period of time, estimated at a month or so, when Eric was in jail, and Sechrest had phone communication with Eric, in which she and Eric discussed "getting boxes" of Sudafed. *Id*. at 22. Johns said that Sechrest asked Gabrielle to purchase it, and then Gabrielle asked Johns to purchase some, so "me, Gabby, and Isaac went and bought some." *Id*. His understanding was that they were buying for Eric to cook it when he was released.

[8] At the sentencing hearing, defense counsel called Sechrest's father-in-law, Gene Sechrest ("Gene"), to testify. Gene testified to not knowing about the drug enterprise, being completely opposed to it, and stating that he would have turned in his family members had he known. When Gabrielle, Isaac, Eric, and Sechrest were arrested, Gabrielle and Isaac's son, Child, was placed with Gene and his wife for a while, and Gene said it was very hard on Child to have his parents (Gabrielle and Isaac) and grandparents (Sechrest and Eric) taken from him. He testified that, when Sechrest was released on bond, Child improved greatly and that Sechrest spent time helping Child to get prepared for kindergarten and providing a positive influence. Gene said at some point Sechrest moved in with Gene and his wife, who had obtained guardianship of Child, and said that Sechrest had "turned [Child] around." *Id*. at 35.

[9] Defense counsel also presented Sechrest's testimony. She discussed the family members in the courtroom that were there to support her, her pending application for social security disability, and her lack of any criminal history, having never been convicted or arrested of a felony or misdemeanor. Sechrest,

who was forty-four years old at the time, stated that it had been more than a decade since she used alcohol. She testified that she stopped using marijuana at the age of twenty-eight and that, when she had used marijuana, it was only occasionally. She testified that she had never consumed or used heroin or methamphetamine. Sechrest testified that, due to her rheumatoid arthritis, she was required to take quite a few prescription medications and had to submit to a blood test every few months for "liver counts," also noting "I'm on Medicaid and I was not going to use any illegal drug to lose Medicaid." *Id*. at 46. She acknowledged that it was unusual that she would be "at the center of a manufacturing ring" given that she did not use illegal substances and had no criminal history. She acknowledged that she helped Eric to bring in what was necessary and that she asked other people to buy boxes of pseudoephedrine from time to time, explaining that Eric "would ask me to ask people to buy boxes." *Id*. at 51. She said that once the precursors were assembled, her husband, Eric, cooked the methamphetamine and distributed it. She testified that the primary income for her and for Eric came from the sale of the drugs. She said that after sales of the methamphetamine, Eric would give her cash and that she would use it to pay the household bills. *Id*. at 54. Sechrest stated that Eric was the person who regularly distributed the methamphetamine, although she acknowledged that she sold it on more than one occasion. *Id*. at 54-55. On cross examination, Sechrest approximated that the operation involved the participation of thirty people, and she confirmed that she was involved only for the money, as she did not use methamphetamine. *Id*. at 78. She also confirmed

that she continued to assemble the precursors while Eric was in jail, at his request. *Id*. at 80.

[10] In her testimony, Sechrest expressed remorse for her involvement, stating that she was "glad this happened" and noting that "somebody could have ended up dead." *Id*. at 79-80. After her arrest, while in jail, Sechrest was involved in support groups, went to church, and had no conduct or contraband reports. After she bonded out, she obeyed the conditions of her bond. She outlined her pending application for social security disability associated with diagnosed rheumatoid arthritis and fibromyalgia. Because her son, C.S., was living with Sechrest at the time of her arrest, he was removed from the home and ultimately adjudicated a child in needs of services ("CHINS"), and Sechrest testified to her involvement with the associated CHINS case, her participation in services, and regular communication with case workers.

[11] At the conclusion of the hearing, and before imposing its sentence, the trial court recognized aggravators and mitigators. The first aggravating circumstance was the facts and circumstances of the criminal enterprise, characterizing it as a "major methamphetamine distribution scheme" and that Sechrest was a "conduit" between Eric and twenty to thirty "smurfs," who would buy the precursors. *Id*. at 86-88. The trial court observed that, while the number of times that the methamphetamine was sold will never be known, it likely was sold "hundreds of times . . . into the streets as a result of this operation." *Id*. The second aggravator found by the trial court was the level of Sechrest's involvement, opining that "the operation might have been shut

down, had it not been for your continued involvement," that in Sechrest's own words it was "easy money," and that she was doing it only for financial gain.[2] *Id.* at 88-89. The third aggravator recognized by the trial court was the danger to the adults and especially to the children, who lived at the residence and were around the methamphetamine operation for some time. *Id.* As mitigators, the trial court recognized that Sechrest had no criminal history and that she pleaded guilty and accepted responsibility for her criminal actions. *Id.* at 86. The trial court sentenced Sechrest to twelve years in the DOC, with six years suspended, and it subsequently memorialized its statements made at the hearing in a written Judgment of Conviction and Pronouncement of Sentence. *Appellant's App. Vol. II* at 29-31. Sechrest now appeals.

## Discussion and Decision

[12] Sechrest contends that her twelve-year sentence with six years suspended to probation for her Level 3 felony conspiracy to manufacture methamphetamine conviction is inappropriate, and she asks us to reduce her sentence. Pursuant to Indiana Appellate Rule 7(B), this Court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Our Supreme Court has explained that the principal

---

[2] The trial court observed that the situation bore resemblance to a popular television series now airing on Netflix, stating, "The fact that you . . . didn't have any use or w[ere] not using methamphetamine is atypical, I'll say that, but I don't know that that's any better or worse. Sounds a little bit, Breaking Bad[-]ish, where someone is just using it for their own financial gain." *Tr. Vol. II* at 89.

role of appellate review should be to attempt to leaven the outliers, "not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). We independently examine the nature of Sechrest's offense and her character under Appellate Rule 7(B) with substantial deference to the trial court's sentence. *Satterfield v. State*, 33 N.E.3d 344, 355 (Ind. 2015). "In conducting our review, we do not look to see whether the defendant's sentence is appropriate or if another sentence might be *more* appropriate; rather, the test is whether the sentence is 'inappropriate.'" *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied*. Sechrest bears the burden of persuading us that her sentence is inappropriate. *Id*.

[13] When determining whether a sentence is inappropriate, the advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Kunberger v. State*, 46 N.E.3d 966, 973 (Ind. Ct. App. 2015); *Thompson v. State*, 5 N.E.3d 383, 391 (Ind. Ct. App. 2014). Sechrest was convicted of a Level 3 felony, and the advisory sentence for a Level 3 felony conviction is nine years, with a range of between three and sixteen years. Ind. Code § 35-50-2-5. Sechrest received a sentence of twelve years, with six years suspended to probation. "In assessing whether a sentence is inappropriate, appellate courts may take into account whether a portion of the sentence is ordered suspended or is otherwise crafted using any of the variety of sentencing tools available to the trial judge." *Thompson*, 5 N.E.3d at 391.

[14] As this court has recognized, "The nature of the offense is found in the details and circumstances of the commission of the offense and the defendant's

participation." *Croy v. State*, 953 N.E.2d 660, 664 (Ind. Ct. App. 2011). On appeal, Sechrest argues that her involvement was "not as deviant" as the trial court characterized, asserting that "[t]here is no evidence that Sechrest herself even knows how to make methamphetamine" and that "Eric was the real brains behind the operation and used Sechrest as a pawn in his operation[,]" as he instructed her and others to obtain pseudoephedrine and other precursors for him. *Appellant's Br.* at 11. She notes that she used the money that she received from Eric to pay day-to-day bills and that they lived in a trailer, often with "upwards of ten people in the trailer," which, she claims "does not paint a picture of a high profile drug operation." *Id.* at 12. Given all of this, she urges that the nature of the offense supports revision of her sentence. We disagree.

[15] Even if, as Sechrest asserts, Eric was "the brains of the operation," she assisted him in the enterprise. That Sechrest did not actually cook the methamphetamine does not absolve her from culpability, and, as the State asserts, "she was a critical part of the production process[.]" *Appellee's Br.* at 9. By her own account, Sechrest would ask people, up to thirty in number, including family and friends, to purchase pseudoephedrine and other precursors, which her husband would later manufacture into finished product, and then sell. This began in at least November 2015 and extended through July 2016. Even if Sechrest was not the primary seller of the methamphetamine, she acknowledged that she sold it on more than one occasion. *Tr. Vol. II* at 54-55. Eric would give Sechrest at least some of the proceeds from methamphetamine sales, and she would use it to pay bills. This reflects a substantial criminal

enterprise, in which Sechrest was intimately involved. We conclude that the nature of the offense does not warrant a reduction in Sechrest's imposed sentence.

[16] "The character of the offender is found in what we learn of the offender's life and conduct." *Croy*, 953 N.E.2d at 664. When considering the character of the offender, one relevant fact is the defendant's criminal history. *Johnson v. State*, 986 N.E.2d 852, 857 (Ind. Ct. App. 2013). Sechrest, at age forty-four, has no criminal history, adult or juvenile, and has never been arrested. She graduated from high school and pursued some college level studies. She explains that she is not employed due to her rheumatoid arthritis, diagnosed in 2005, and fibromyalgia, diagnosed in 2012, and is seeking disability benefits. She reminds us that she was released on bond in April 2017 and did not commit any offenses, and she participates with DCS and services provided. Sechrest notes that she pleaded guilty as charged and that she did not receive the benefit of reduced or dismissed charges. She urges that her character warrants a reduction in her sentence.

[17] Here, Sechrest participated with her husband in a methamphetamine production enterprise. The State suggests, and we agree, that Sechrest's involvement was ongoing and was not "a momentary lapse of judgment." *Appellee's Br*. at 10. She did not use methamphetamine, and never had. That is, she was involved only to make money, not fuel her own addiction. She involved up to thirty people in the operation, including her own daughter, Gabrielle, who was one of many that Sechrest asked to purchase precursors.

Although Gabrielle was using the manufactured methamphetamine, Sechrest continued to have Gabrielle as an active participant in the scheme. Sechrest points to Eric as the mastermind of the operation, but when he was in jail, Sechrest kept the process going, asking friends and family to purchase the pseudoephedrine. The various precursors would be retained, and the product eventually manufactured, in Sechrest's residence, where her teenage son, a young grandchild, and the Gallaghers' two small children were residing. These decisions do not reflect positively on Sechrest's character.

[18] Our task on appeal is not to determine whether another sentence might be more appropriate; rather, the inquiry is whether the imposed sentence is inappropriate. *Barker*, 994 N.E.2d at 315. Sechrest has failed to carry her burden of establishing that her sentence is inappropriate in light of the nature of the offense and her character.

[19] Affirmed.

Vaidik, C.J., and Riley, J., concur.