**Robert D. STOREY, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 20A03–0410–CR–465.

Court of Appeals of Indiana.

July 19, 2005.

Michael S. Greene, Elkhart, for Appellant.

Steve Carter, Attorney General of Indiana, Matthew D. Fisher, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

MAY, Judge.

Robert D. Storey appeals his convictions of possession of methamphetamine in excess of three grams with intent to deliver, a Class A felony,[1] and manufacture of methamphetamine in excess of three grams, also a Class A felony.[2] Storey raises one issue, which we restate as whether the trial court erred in admitting into evidence his written confession.

We reverse and remand.[3]

### FACTS AND PROCEDURAL HISTORY

On July 21, 2003, Glen Graber's wife told him something was going on in the corn-

---

1. Ind.Code §§ 35–48–4–1(a)(2)(C) and 35–48–4–1(b)(1).

2. Ind.Code §§ 35–48–4–1(a)(1)(A) and 35–48–4–1(b)(1).

3. We heard oral argument May 13, 2005, at the Elkhart County Courthouse in Goshen, Indiana. We commend counsel for their appellate advocacy and thank the Elkhart County Bench and Bar for their gracious hospitality.

field near his workshop in Elkhart County. Graber and his son went to the field to determine what was happening. About two to four rows into the field, Graber found an air tank and two sets of footprints that ran between the rows of corn. Graber's friend, Duane Yoder, came along in a vehicle. The three men followed a woman in a maroon car whom Graber had previously seen drop off one or more individuals who walked into the field. Graber and Yoder recorded the license plate number and Graber alerted authorities.

Graber, his son, and Yoder went back to the cornfield and contacted Eugene Moser, who owned the cornfield. As the men discussed what had happened, Storey walked out of the cornfield wearing a sweatshirt, stocking cap, and gloves on a "real warm" day. (Tr. at 54.) Storey told them he had been looking for a lost dog. Storey walked away in the direction of a nearby railroad track. One of the men followed Storey, and Storey ran and hid in a patch of bushes.

■ Shortly thereafter, Elkhart County Sheriff's Deputy Jason Reaves arrived and told Storey to come out from his hiding place. After Storey did not respond, Deputy Reaves "got on [his] PA" (*id.* at 116), and said that he was going to come in the bushes with a canine if Storey did not come out with his hands up. Deputy Reaves then "barked like a dog" and Storey emerged. (*Id.*) Deputy Reaves handcuffed Storey, placed him in his police car, and read him his *Miranda* rights.[4] Storey immediately asked for an attorney.

Deputy Reaves drove back to the cornfield with Storey handcuffed in the back of his car. In the field, Deputy Reaves found a jar containing "a [sic] orange sludge like substance" (*id* at 120) and a coffee filter containing "a crystal like substance." (*Id.*) The deputy called the crime lab to collect and examine the evidence in the field. Soon thereafter, Joseph Caron was arrested when another officer found him walking on a nearby road.

While driving Storey to the police station, Deputy Reaves told Storey what he had found in the cornfield. During the approximately twenty-five minute car ride, Deputy Reaves did not ask Storey any questions. However, Deputy Reaves continued talking "out loud," (Suppression Hearing Tr. at 37), telling Storey that he was going to arrest anyone having anything to do with the methamphetamine operation, including the driver of the car that had dropped Storey and Caron off at the cornfield. Deputy Reaves knew the driver was Storey's wife. Deputy Reaves told Storey that Caron had been arrested near the cornfield and Caron stated he was "just along with [Storey] helping out." (*Id.* at 39–40.) Storey responded by blaming Caron and then asked to speak with "somebody" because "[he] couldn't talk to [Deputy Reaves]." (*Id.* at 41.)

Deputy Reaves contacted Detective Richard Drinkwine before arriving at the station. Detective Drinkwine read Storey his *Miranda* rights and Storey signed a waiver of his rights. During Detective Drinkwine's questioning, Storey confessed to cooking methamphetamine in the cornfield. The detective prepared a written statement. Storey initialed the written confession statement and eventually signed the bottom of the statement, confessing to purchasing materials for manufacturing methamphetamine and to possessing methamphetamine.

---

**4.** The *Miranda* warnings inform the defendant of his right to remain silent and to have an attorney, and warn the defendant that any statement he makes may be used as evidence against him. *Loving v. State,* 647 N.E.2d 1123, 1125 (Ind.1995).

Storey was charged with Class A felony possession of methamphetamine and Class A felony methamphetamine manufacture. Prior to his trial, Storey filed a motion to suppress his written statement to police. The trial court denied his motion after an evidentiary hearing. A jury found Storey guilty of both counts. He was sentenced to forty-five years for each conviction, with the sentences to be served concurrently.

## DISCUSSION AND DECISION

### Confession

 When a defendant challenges the admission of his confession, the State must prove beyond a reasonable doubt the confession was given voluntarily. *Jackson v. State,* 735 N.E.2d 1146, 1153 (Ind.2000). On review, we look to the totality of the circumstances surrounding the waiver of rights and confession. *Id.* We focus on whether the waiver or confession was free, voluntary, and not induced by violence, threats, promises, or other improper influences. *Id.* When considering on appeal the admissibility of a confession, we will uphold the trial court's decision if there is substantial evidence of probative value to support it. *Id.* We do not reweigh the evidence, and we consider any conflicting evidence most favorably to the trial court's ruling. *Taylor v. State,* 689 N.E.2d 699, 702 (Ind.1997).

Storey argues the trial court erred by admitting his statement into evidence because it was taken by coercive means and not voluntarily given. Storey asserts his statement was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because after his arrest he asserted his Fifth Amendment right to counsel but Deputy Reaves did not end the interrogation.

Rights under *Miranda* apply only to custodial interrogation. *Albrecht v. State,* 737 N.E.2d 719, 727 (Ind.2000). When Storey confessed, he was in custody; he had been arrested and read his *Miranda* rights. Thus, the first element of a *Miranda* violation is fulfilled. *See White v. State,* 772 N.E.2d 408, 412 (Ind.2002); *see also Pasco v. State,* 563 N.E.2d 587, 593 (Ind.1990) (A defendant is in custody if he is formally arrested or is subjected to restraints on his freedom such that a reasonable person in his position would believe he is not free to leave.).

Storey likens his situation to that in *Alford v. State,* 699 N.E.2d 247 (Ind.1998). Alford argued his statement was obtained in violation of *Miranda,* and he challenged the admissibility of the statement at a hearing on his motion to suppress. Our supreme court stated:

> At the hearing on the motion to suppress, [the interrogating officer] testified that Alford was arrested at his home and brought to the "Investigator's Office" in the police station where he was read his Miranda rights and signed a rights waiver form. [The officer] asked him "if he wanted to talk to me about the incident or why he was there, he hesitated and said at that point in time, [']I think it would be in my best interest to talk to an attorney['']." [The officer] acknowledged that Alford had that right, but did not cease the interrogation. Instead [the officer] testified he "wanted to explain to [Alford] the facts of the case" and told him that the police had recovered the guns and [the victims'] driver's license at the creek, that they were holding his tennis shoes as evidence, and that they knew that [the victim] had pointed a shotgun at Alford's chest. Alford interrupted [the officer's] recitation and confessed to shooting [the victim], but maintained that it was in self defense. [The officer] then turned on a video camera and asked Alford to

repeat his story on videotape resulting in the detailed statement that was later played to the jury.

*Id.* at 250. Our supreme court held the police officer's continued interrogation of Alford was in "blatant" *id.* violation of Alford's Fifth Amendment right to counsel:

> [T]he standard for whether police "interrogate" a suspect is not whether questions are asked but whether the police should know that their words or actions are "reasonably likely to elicit an incriminating response from the suspect." [The officer's] monologue about the discovery of potentially incriminating evidence had no apparent purpose other than to induce Alford to say something inculpatory.

*Id.* (internal citations omitted).

Storey made an unequivocal request for counsel immediately after Deputy Reaves placed him in the car and read him his *Miranda* rights. At the suppression hearing, Deputy Reaves testified:

Q All right. I had asked you, did you have any other conversations with Mr. Storey after he said that he wanted to speak with an attorney?

A I have a habit of speaking out loud about what I find; and, you know, he seemed pretty excited about what I found and denied everything without even seeing what I found. I did have a conversation with him and about what I'm finding.

Q So were you asking him questions or just telling him—

A I was telling him.

Q —what you found?

A Right.

\* \* \* \* \* \*

Q Now, at any point—you said—okay. He sat there in the corn field in your car for about an hour. Is that right?

A Around that.

Q And then at some point, you left the corn field and brought him back to the Sheriff's Department. Is that right?

A Yes.

Q And about how long of a drive is it from where you were on County road 44?

A I would say 25, 30 minutes.

Q And during that time, did you ask him any questions?

A Well, we were—we were talking, and I made, like, I said, I spoke out loud, and I said I'm going to arrest anything [sic] that has anything to do with that and that includes the driver of the vehicle.

\* \* \* \* \* \*

Q Did you have any information as to who the driver of that vehicle was?

A I did found [sic] out the driver was Mr. Storey's wife.

\* \* \* \* \* \*

Q After you made that statement, did Mr. Storey say anything?

A Even prior to that, Mr. Storey said—I spoke with Mr. Caron, and Mr. Caron—he wanted to speak. I read him his rights. He told me he was just along with Robert Storey helping out, and I went back and told Storey that. I didn't ask him any questions. I just told him what Mr. Caron said[.]

\* \* \* \* \* \*

A Mr. Caron yeah, he said it was—I mean, back and forth. They were trying to blame it on each other. I mean, he still doesn't even know what it was, and he's trying to blame it on Caron.

**Q** So you're saying that after you told Mr. Storey what Mr. Caron had said, Mr. Storey volunteered that information about what was going on out there?

**A** I told Mr. Storey that—I read him his rights. I can't ask him any questions about what's going on. Whether he wants to speak, you know, I'm not going to ask him any questions.... I never asked him a direct question about the situation.

(Suppression Hearing Tr. at 37–40.)

■ The State concedes Deputy Reaves' behavior was improper. We agree his monologue constituted "interrogation" for purposes of *Miranda* although no questions were asked. Reaves' monologue about his discovery of potentially incriminating evidence and the likelihood Storey's wife would be arrested had no apparent purpose other than to induce Storey to say something inculpatory. *See Alford*, 699 N.E.2d at 250; *see also Loving v. State*, 647 N.E.2d 1123, 1126 (Ind.1995) (police officer's comment on the inconsistency between the defendant's account and the physical evidence amounted to interrogation). Deputy Reaves' continued interrogation of Storey was in blatant disregard of Storey's Fifth Amendment right to counsel.

Storey contends his subsequent written confession to Detective Drinkwine was induced by Deputy Reaves' speech on the way to the station. Specifically, Storey asserts:

It was Officer Reaves' illegal conduct that made [Storey] decide he would talk to someone in the drug taskforce so he could help his wife stay out of jail. Therefore, as a matter of law it cannot be said that [he] voluntarily and knowingly waived his right to first speak to his attorney before he gave the purported written confession.

(Appellant's Br. at 9–10.)

The State maintains, however, that Storey's written confession was properly admitted because no threats or promises were made to obtain his waiver of rights or his statement. The State notes Storey was informed twice of his *Miranda* rights and was advised of additional rights before preparing his written statement with Detective Drinkwine. Therefore, it argues, "any taint that Deputy Reaves' statements might have lent to the proceedings was cured by the subsequent advice of rights to Storey" (*id.* at 6), and Storey had additional time to reflect before giving his confession to Detective Drinkwine.

■ After the Fifth Amendment right to counsel is invoked, a waiver in response to police-initiated interrogation, even after additional *Miranda* warnings, is not sufficiently voluntary and intelligent to meet the mandate of the Fifth and Fourteenth Amendments. *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *see also Heffner v. State*, 530 N.E.2d 297, 303 (Ind.1988).

■ The Supreme Court held in *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), that once the accused requests counsel, officials may not reinitiate questioning "until counsel has been made available" to him. *Edwards* found it "inconsistent with *Miranda* and its progeny for the authorities, at this instance, to *reinterrogate* an accused in custody if he has clearly asserted his right to counsel." *Id.* at 485, 101 S.Ct. 1880 (emphasis added) "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation

even if he has been advised of his rights." *Id.* at 484, 101 S.Ct. 1880.

 Accordingly, when a suspect asserts the right to counsel during custodial questioning, the police must stop the interrogation until counsel is present or the suspect reinitiates communication with police and waives the right to counsel. *Jolley v. State*, 684 N.E.2d 491, 492 (Ind. 1997). The initiation of further communication by an accused is not by itself sufficient to establish a waiver of the previously asserted right to counsel. *Osborne v. State*, 754 N.E.2d 916, 922 (Ind.2001). If the accused has initiated further communication, then the subsequent inquiry is whether there is a valid waiver of the right to counsel; that is, whether the purported waiver was knowing and intelligent under the totality of the circumstances. *Id.* The "totality of the circumstances" test focuses on the entire interrogation, not on any single act by police or the condition of the suspect. *Light v. State*, 547 N.E.2d 1073, 1079 (Ind.1989). We review the record for evidence of inducement by way of violence, threats, promises, or other improper influences. *Berry v. State*, 703 N.E.2d 154, 157 (Ind.1998).

During the hearing on the motion to suppress, Deputy Reaves testified that when Storey asked to speak with someone about what happened, the following exchange took place:

Q All right. Now, at any point, did Mr. Storey ask to talk with somebody about what had happened [sic] what had been going on out there?

A Yes. He said he wanted to speak to—I told him it was going to be Detective Drinkwine, and he said he wanted to speak to the detective and let him know, even though he already said he wanted an attorney.

Q Okay. At—did that—do you recall whether or not that occurred before or after the subject of his wife came up?

A That was—that was before the subject of his wife because that was when I was telling him what Mr. Caron had said, and he was, like, I'm going to talk to somebody. I can't talk to you. I've read you your rights. I ain't talking to you, you know[.]

(Suppression Hearing Tr. at 40–41.)

Subsequently, Storey was taken to the patrol room of the police station. Detective Drinkwine testified the following occurred there:

A [Storey] said, "Are you the detective", [sic] after I introduced myself already, is [sic] said, "Yes, I am the detective." I took him back into my office ... and I sat him in a chair, and I read him his rights at that point.

Q And at that point, did he voluntarily—did he continue to cooperate and give you a statement?

A Yes, he did.

\* \* \* \* \* \*

Q All right. Now, approximately, how long did does [sic] it take—did it take you to prepare [the written confession]?

A We talked probably for an hour.

Q And during that time, did Mr. Storey ever indicate that he wanted to speak with an attorney again?

A No, he did not.

Q Did he—did the subject of his wife come up at all?

A Yes, it did.

Q How did that subject come up?

A He said that the other officer wanted to arrest his wife. I told him that the other officer in this particular

case is subordinate to me, and he wasn't going to arrest his wife for dopping [sic] him off in the corn field.

Q And did you have any interest in pursuing charges against the wife?

A No, sir.

Q Did you communicate that to Mr. Storey?

A Yes, I did.

Q At some point, did you have to leave the room where Mr. Storey was in?

A Yes, I did.

\* \* \* \* \* \*

Q When you left, did you leave him there by himself?

A No.... I asked [Officer Reaves] to come down to my office and sit with Mr. Storey[.]

\* \* \* \* \* \*

Q When you came back, was Mr. Storey and Officer Reaves—were they talking at all?

A Oh, yeah.

Q Do you recall what they were talking about?

A They were talking with each other. Mr. Storey was agitated. Officer Reaves was agitated as well. I sent Officer Reaves out of the room immediately.

Q All right. Now, with regard to [the signed confession], there's—Mr. Storey's signature appears on that exhibit, doesn't it[?]

A That's correct, sir.

Q And your signature is on there as well[.]

A Yes, it is.

Q Did Mr. Storey sign that statement voluntarily?

A Yes, he did.

(*Id.* at 51–54.)

The testimony reveals Detective Drinkwine read Storey his *Miranda* rights. Storey mentioned to the detective that Deputy Reaves intended to arrest his wife, and when he learned the detective had no interest in pursuing charges against his wife, he decided to sign the waiver form and give a statement. Detective Drinkwine testified Storey was not threatened, physically assaulted, or coerced in any way.

Storey testified the following took place at the police station:

Q Okay. And did you ever tell [Detective Drinkwine] that you didn't want to talk?

A Even after the statement was given to [Detective Drinkwine], I told him I didn't want to sign it. At that point, he told me he had a video—or a recording, a tape recording of the confession, and also he called Mr. Reaves back into the room, and he left the room for a few minutes[.]

Q Who left the room?

A The officer there.

Q Okay. Drinkwine?

A Yes, sir.

Q Okay.

A When he came back into the room, he and Officer Reaves were kind of having words because he threatened to go back after my wife again 'cause I didn't want to sign the statement.

Q Okay. And so—

A When he came in, he just—it kind of blew off, and then Reaves left[.]

Q And then you signed it.

A Yes, I did.

(*Id.* at 16–17.)

Storey clearly indicated his desire for counsel. Instead of breaking off communi-

cation, Deputy Reaves persisted in going over the evidence he found that he believed implicated Storey. He also indicated he would arrest Storey's wife for her involvement in the crime. Storey maintains "[i]n determining whether a confession was given voluntarily, the attention of the trial judge should be focused ... on the question whether the behavior of the state's law enforcement officials was such as to overbear defendant's will to resist and bring about confessions not freely self-determined[.]" (Appellant's Br. at 9.)

Storey relies on our supreme court's decision in *Hall v. State*, 255 Ind. 606, 266 N.E.2d 16 (1971), to support his assertion Officer Reaves' suggestions he would arrest Storey's wife in connection with crimes charged were threats of the sort that would call into question the voluntariness of his statement. In *Hall*, our supreme court recognized the voluntariness of a defendant's confession may be attacked when the State makes threats against the family of the accused, even when the threats may not be carried out. In order to prevail on such a challenge, however, the defendant must present evidence of direct threats made by the police. *Brown v. State*, 587 N.E.2d 111, 113–14 (Ind.1992).

In *Hall*, the police told Hall that if he did not confess, they would arrest his wife, charge her with the crime, and place his small children in the custody of others. *Id.* at 19. Our supreme court held that "when the threat to so charge and attempt to convict [the family member] is made by police to 'encourage' the [defendant] to make a full confession, we cannot say as a matter of law that the confession is given freely and voluntarily." *Id.* However, there must be a showing that but for the threat or inducement, the confession might not have occurred. *Id. See generally* Caroll J. Miller, Annotation, *Voluntariness of Confession as Affected by Police Statements That Suspect's Relatives Will Benefit by the Confession*, 51 A.L.R.4th 495 (1987 & Supp.2004).

The State argues Deputy Reaves' comments about Storey's wife are not relevant to the determination of the voluntariness of his statement pursuant to *Ellis v. State*, 707 N.E.2d 797 (Ind.1999). Our supreme court rejected Ellis' claim his confession was improperly admitted into evidence.

The trial court determined Ellis gave a videotaped statement voluntarily and admitted it into evidence. Ellis maintained the statement was not voluntary because the police used improperly threatened to prosecute his brother and sister. Ellis relied on *Hall* in asserting the officers' suggestions that they could arrest his siblings in connection with the victim's murder were threats of the sort that would call into question the voluntariness of his statement.

Our supreme court disagreed:

We find Defendant's reliance on *Hall* to be misplaced. First, in *Hall* the police gave a "clear implication" to the defendant that if he did not confess, they would arrest his wife. Here, the police did not state that Defendant must confess to avoid the arrest of his siblings. Rather, they suggested that given the cooperation of Defendant's siblings, Defendant's own lack of cooperation could only magnify their roles as suspects in the crime. In any event, we find that the alleged "threats" alone did not render Defendant's statement involuntary. Considering the fact that Defendant's siblings gave statements implicating him in the victim's death, we are not convinced that the possibility of their arrest would have had an unduly coercive effect on Defendant.

*Id.* at 802.

■ We have before us conflicting testimony as to what Deputy Reaves told

Storey regarding the arrest of his wife. However, we find the circumstances present in this case are more analogous to the facts in *Hall*. Deputy Reaves told Storey he could arrest all persons involved in the crime, including the person who dropped Storey off in the field. Deputy Reaves testified he found out the driver was Storey's wife. Even though Storey's wife was a suspect and might well have been charged and convicted, when the threat to so charge and attempt to convict was made by police officers to 'encourage' Storey to make a full confession, we cannot say as a matter of law Storey's confession was given freely and voluntarily. *See Hall*, 266 N.E.2d at 19.

Viewing the totality of the circumstances surrounding Storey's confession, we conclude Deputy Reaves' continued interrogation of Storey violated Storey's Fifth Amendment right to counsel and therefore his confession should have been suppressed.

### Harmless Error

 Statements obtained in violation of the federal constitution and erroneously admitted are subject to harmless error analysis. *Alford*, 699 N.E.2d at 251. "A federal constitutional error is reviewed *de novo* and must be 'harmless beyond a reasonable doubt.'" *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). The State bears the burden of demonstrating that the improper admission of a defendant's statement did not contribute to the conviction. *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). "To say that an error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Id.* (quoting *Yates v. Evatt*, 500 U.S. 391, 403,

111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), *disapproved on other grounds by Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). If the State has presented other overwhelming evidence of the defendant's guilt, then an erroneously admitted statement may be deemed harmless. *See Rawley v. State*, 724 N.E.2d 1087, 1090 (Ind.2000).

The State relies on the following evidence admitted at trial to support its argument that the admission of Storey's statement was harmless error:

> After stumbling upon what later turned out to be an active methamphetamine lab, several persons were startled by the sudden appearance of Storey at the precise location of the lab. Story [sic] was wearing a sweatshirt, stocking cap, and work gloves in the middle of July. Storey then explained that he was looking for a dog and set off, but ran and hid in a thicket when he noticed that he was being followed, behavior that is hardly consistent with his story. Storey's presence at the scene, coupled with his suspicious behavior, is overwhelming evidence of his guilt, rendering any error the trial court may have made in the admission of his written statement harmless.

(Appellee's Br. at 9.)

We decline to adopt the State's characterization of Storey's unusual attire and act of hiding in a thicket as "overwhelming evidence" he was guilty of possessing or manufacturing methamphetamine.. Accordingly, we hold the error in admitting his confession was not harmless and therefore we must reverse.

 Retrial following reversal for improperly admitted evidence does not subject a defendant to double jeopardy so long as all the evidence, even that erroneously admitted, is sufficient to support the

jury verdict. *Carpenter v. State*, 786 N.E.2d 696, 705 (Ind.2003). Considering all the evidence presented at trial, including Storey's improperly admitted confession, there was sufficient evidence to convict Storey. *See, e.g., Lockhart v. Nelson*, 488 U.S. 33, 34, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) (a defendant who succeeds in having a conviction set aside because of trial error may be retried for the same offense without violating the Double Jeopardy Clause of the U.S. Constitution); *Stahl v. State*, 686 N.E.2d 89, 94 (Ind.1997) ("[I]f all the evidence, even that erroneously admitted, is sufficient to support the jury verdict, double jeopardy does not bar a retrial on the same charge."). Accordingly, we remand for a new trial.

## CONCLUSION

The police officer's interrogation violated Storey's Fifth Amendment right to counsel. Therefore, Storey's confession should have been suppressed. As the error was not harmless, we must reverse. However, the Double Jeopardy Clause does not prevent the State from re-prosecuting Storey.

We reverse and remand for a new trial.

BARNES, J., and VAIDIK, J., concur.