## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 01 2020, 10:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark S. Lenyo
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Rahim Brumfield,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 1, 2020

Court of Appeals Case No.
19A-CR-1581

Appeal from the St. Joseph
Superior Court

The Honorable Jeffrey L.
Sandford, Judge

Trial Court Cause No.
71D03-1802-MR-2

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Rahim Brumfield (Brumfield), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1, and the jury's determination that he was eligible for a firearm sentencing enhancement, I.C. § 35-50-2-11.

We affirm.

# ISSUES

Brumfield presents this court with three issues on appeal, which we consolidate and restate as the following two issues:

> (1) Whether the trial court abused its discretion by admitting certain evidence; and
>
> (2) Whether the trial court improperly instructed the jury.

# FACTS AND PROCEDURAL HISTORY

In January 2018, Brumfield and seventeen-year-old T.C. had been in a romantic relationship for about four years. On the night of January 17, 2018, leading into the early morning of January 18, 2018, Brumfield and T.C. exchanged text messages via Facebook Messenger. Brumfield accused T.C. of being unfaithful, and T.C. wanted to terminate the relationship. At some point, T.C. asked Brumfield to stop contacting her and to leave her alone.

Later that day, T.C. was at her best friend's, D.K., house. At approximately 5:30 p.m., T.C. left D.K.'s house; however, they both intended to get together

again later that evening to go to Walmart. At approximately 8:00 p.m., T.C. called D.K., and T.C. seemed upset about something. At around the same time, Michael Onax (Onax) was driving home from work. Onax observed a red vehicle parked in the middle of Clover Street in South Bend, and he "only saw one person in[side] the vehicle. It was a woman." (Transcript Vol. II, p. 99). As he drove closer, he saw a man who was wearing a red hooded sweatshirt trying to open the front passenger door. Onax then saw the man with the red hooded sweatshirt grab onto the "passenger's side mirror" and hold on as the red car sped off. (Tr. Vol. II, p. 99). Since there was snow on the ground, the man was "just slipping and sliding . . . down the street." (Tr. Vol. II, p. 99). Onax then saw the man with the red hooded sweatshirt "lift up his hand" and heard "gunshots fire rapidly." (Tr. Vol. II, p. 100).

[6] Aaron Maurer (Maurer), who lived on Clover Street, was rocking his baby by the window. Maurer first heard somebody yelling, and then he saw a man with a "red hoodie [with his] arm inside the car being pulled along the street. The car was accelerating and taking him with it." (Tr. Vol. II, p. 108). Once the red vehicle was out of his view, Maurer heard "about nine or ten shots." (Tr. Vol. II, p. 108). Also, around the same time, Maria Santos (Santos), who also resided on Clover Street, was in her bedroom sleeping. Santos was awakened by the sound of gunshots. When she looked out of the window, Santos saw that a red vehicle had crashed into a house and flipped on its side. Santos saw a man with a hooded sweatshirt attempt to pull the vehicle down. When that failed, the man stated, "[s]hit, I need to find a fucking car," and the man ran

toward an alley. (Tr. Vol. II, p. 140). Another neighbor who heard the gunshots called 911.

[7] When South Bend Police Department officers arrived at the scene, they found T.C. inside the red vehicle. She was unconscious and had no pulse. T.C.'s cause of death was later determined to be from a "gunshot wound to the back of her head." (Tr. Vol. III, p. 19). The police recovered seventeen casings at the scene of the shooting.

[8] On January 19, 2018, Brumfield's mother contacted Detective Timothy Wiley (Detective Wiley), and stated that she was bringing Brumfield to the police station. After Brumfield was given his *Miranda* warnings, Brumfield stated that he had been with T.C. earlier that day, but he denied arguing with T.C. and having any involvement in her killing. During questioning, Brumfield gave Detective Wiley his phone number. Shortly thereafter, Brumfield stated that he did not want to talk, but the questioning continued.[1] After the interview, Brumfield was released.

[9] Using Brumfield's cellphone number, Detective Wiley discovered Brumfield's Facebook account under an alias, Gunna Hardaway, and he obtained a warrant to search that account. The Facebook messages between Brumfield and T.C., which were exchanged a day before she was murdered, indicated that the two

---

[1] The trial court ultimately excluded all of Brumfield's statements after he stated that he no longer wished to continue with Detective Wiley's questioning.

were having relationship problems. The messages further showed that when T.C. ended her four-year romantic relationship with Brumfield, Brumfield was upset and he threatened to kill T.C. Some of Brumfield's messages to T.C. stated: "When I pop yo ass don't say nun . . . I'll kill yo [] anybody [] think we over . . . When I say ima kill [] yu I mean that . . . I'm not letting go unless its from putting inna dirt." (State's Exh. Vol. 5, pp.118, 125, 137) (mistakes throughout).

[10] Based on Brumfield's death threats to T.C., Detective Wiley obtained a warrant for Brumfield's cellphone location which revealed that on January 18, 2019, at approximately 8:12 p.m., Brumfield was at the murder scene and he had moved away from the area by 8:16 p.m.

[11] On February 7, 2018, the State filed an Information, charging Brumfield with murder. The State further claimed that Brumfield was eligible for a sentencing enhancement because he had used a firearm in the course of committing the murder. A warrant was issued for Brumfield's arrest. On February 24, 2018, Brumfield turned himself in and spoke with Detective Wiley. At the start of the interview, Brumfield was given his *Miranda* warnings. Brumfield denied being involved in T.C.'s murder, indicated that he knew who killed T.C., but stated he did not want to be a "snitch." (State's Exh. Vol. VI, p. 184). When Detective Wiley pressed Brumfield to identify T.C.'s killer, Brumfield began floating an idea that T.C. was killed by a gang. When asked to identify the gang, Brumfield declined to answer the question, instead, he stated that he would "just rather have a lawyer." (State's Exh. Vol. VI, p. 184). No

additional questions were asked; instead, Detective Wiley sought to clarify Brumfield's request for an attorney. Rather than persisting with his request for an attorney, Brumfield stated that he wished to continue with the interview. Brumfield then resumed explaining his theory that T.C.'s killing was gang related, and he identified the gang as "Four Corner Hustlers." (State's Exh. Vol. II, p. 185). Detective Wiley proceeded to ask Brumfield whether he and T.C. had a verbal altercation on the day before she was murdered. Brumfield admitted arguing with T.C., and he also admitted that he regularly messaged T.C. on Facebook. When Detective Wiley indicated that he had not "even got[ten] to the hard questions yet," Brumfield stated that he wanted to stop the interview. (State's Exh. Vol. VI, p. 192). Based on the request, Detective Wiley concluded the interview, and Brumfield was remanded into custody.

[12] On January 27, 2019, pursuant to Indiana Rule of Evidence 404(b), Brumfield filed a motion in *limine*, requesting the exclusion of any evidence of him making any threats to kill T.C. and past physical abuse toward T.C.

[13] On May 9, 2019, at the start of his bifurcated jury trial, Brumfield requested, but was denied, the suppression of the transcript and recording of his February 24, 2018, interview conducted by Detective Wiley. Also, the parties litigated Brumfield's motion *in limine*. The State argued that Brumfield's prior bad acts, *i.e.,* his Facebook messages to T.C. in which he threatened to kill T.C., were admissible to prove motive and intent pursuant to Indiana Evidence Rule 404(b). Brumfield argued that the State had not provided him with pretrial notice of its intent to use those Facebook messages for that purpose. Excusing

the lack of pretrial notice, the State argued that Brumfield had notice, "a long time ago" since Brumfield's death threats to T.C. had been referenced in the probable cause affidavit. (Tr. Vol. II, p. 4). At the close of the parties' arguments, the trial court granted Brumfield's motion, in part, by stating that it was "going to let all threats [] come in under the basis of motive but not to show intent." (Tr. Vol. II, p. 10). The trial court indicated that it would issue a limiting instruction pursuant to that ruling.

[14] During the first phase of Brumfield's trial, Jermon Gavin (Gavin), an inmate who was confined about the same time with Brumfield at the St. Joseph County Jail, testified that Brumfield had disclosed to him that on the day of the shooting, Brumfield had seen T.C. in the car with "J-Dot," a man that T.C. "was messing with." (Tr. Vol. III, p. 161). Brumfield further divulged to Gavin that he "got mad and began shooting." (Tr. Vol. III, p. 161). Gavin added that Brumfield told him that "he wasn't trying to hit [T.C.], . . . he was just trying to scare [T.C.]. But it is what it is." (Tr. Vol. III, p. 161). Brumfield indicated to Gavin that he had "shot over twelve times." (Tr. Vol. III, p. 161).

[15] After the parties' arguments, a jury instruction conference was held. Based on Gavin's testimony that Brumfield fired many shots toward a vehicle occupied by J-Dot and T.C. and that the shots were not intended for T.C., the State offered an instruction on transferred intent. Over Brumfield's objection, the trial court issued that instruction to the jury. The jury consequently found Brumfield guilty of murder. During the second phase of Brumfield's trial, the jury found Brumfield guilty of using a firearm during the commission of the

murder. On June 14, 2019, the trial court sentenced Brumfield to fifty-five years for his murder conviction, and it enhanced that sentence by five years based on the use of a firearm, resulting in an aggregate term of sixty years.

Brumfield now appeals. Additional information will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Admission of the Evidence*

### A. *Standard of Review*

Trial courts are vested with broad discretion in determining whether to admit or exclude evidence. *Satterfield v. State*, 33 N.E.3d 344, 352 (Ind. 2015). A trial court's decision to admit or exclude certain evidence is subject to review only for an abuse of discretion. *Id*. On appeal, "[w]e consider all the facts and circumstances surrounding the trial court's decision to determine whether it is 'clearly against the logic and effect' of what those facts and circumstances dictate." *Id*. (quoting *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014)). We "'may affirm a trial court's judgment on any theory supported by the evidence.'" *Id*. (quoting *Clark v. State*, 808 N.E.2d 1183, 1188 (Ind. 2004)). Even if we find that the trial court abused its discretion by excluding evidence, such error will be "disregarded as harmless error" unless it "affect[s] the substantial rights of a party." *Hubbell v. State*, 754 N.E.2d 884, 890 (Ind. 2001).

Brumfield first asserts that during his second recorded interview with Detective Wiley, he invoked his right to counsel and that request was ignored. As such, Brumfield contends that the trial court abused its discretion by admitting into

evidence the statements he made at that interview following his request. Furthermore, Brumfield claims that the trial court abused its discretion by admitting into evidence his Facebook messages to T.C. pursuant to Indiana Evidence Rule 404(b). We will address each contention in turn.

## B. *Request for an Attorney*

[19] "The right to have counsel present during [custodial] interrogation 'is indispensable' to the protection of the Fifth Amendment privilege against self-incrimination." *Jolley v. State*, 684 N.E.2d 491, 492 (Ind. 1997) (quoting *Miranda v. Arizona*, 384 U.S. 436, 469, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). "When a suspect asserts his right to counsel during custodial questioning, the police must stop until counsel is present or the suspect reinitiates communication with the police and waives his right to counsel." *Id.* at 492 (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). Importantly, "the prosecution may not use statements stemming from that interrogation unless it demonstrates the use of procedural safeguards effective to secure [the suspect's] privilege [.]" *Davies v. State*, 730 N.E.2d 726, 733 (Ind. Ct. App. 2000) (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1602), *trans. denied*.

[20] "Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). While the suspect need not invoke any magic words, "[t]he cessation of police questioning is not required 'if a suspect

makes a reference to an attorney that is ambiguous or equivocal[.]'" *Carr v. State*, 934 N.E.2d 1096, 1102 (Ind. 2010) (quoting *Davis*, 512 U.S. at 459). A statement is considered ambiguous or equivocal when "'a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel.'" *Id.* (quoting *Davis*, 512 U.S. at 459).

[21] After Brumfield was charged with the instant offenses, a warrant for his arrest was issued, and he turned himself in. On February 24, 2018, Detective Wiley conducted a recorded interview, and after Brumfield was given his *Miranda* warnings, he denied any involvement in T.C.'s murder but stated that he had heard that a gang was responsible. When Detective Wiley pressed Brumfield to identify the gang, the following exchange occurred:

> [Detective Wiley]: So . . . you know the group[?]
>
> [Brumfield]: I don't know the group, . . . I heard . . . what the streets told me. If you go . . . to the streets, the streets tell you the same thing[.] I'm just not gonna tell you what everybody tell me because it's like that's gonna make me a snitch at the end of the day. They're gonna classify me as a snitch []. I'm not no snitch.
>
> * * * *
>
> [Detective Wiley]: So you're not gonna tell us what group you think killed your girlfriend?
>
> [Brumfield]: I don't think, I know.

[Detective Wiley]: You're not gonna tell us what group you know did it?

[Brumfield]: No, I don't, I'd just rather have a lawyer.

[Detective Wiley]: You don't . . .

[Brumfield]: You know, for my lawyer can do 'cuz at the end of the day y'all just keep on. And . . . I just came in here. . .

[Detective Wiley]: Okay.

[Brumfield]: . . .to let y'all know . . .

[Detective Wiley]: [Brumfield]

[Brumfield]: . . . that I did not do this.

[Detective Wiley]: . . . you just said you wanted a lawyer. Do you want a lawyer and you wanna stop? Is that what I'm hearin[g]?

[Brumfield]: I mean if . . . at the end of the day I'm gonna have to get a lawyer anyway 'cuz y'all are not gonna . . . .

[Detective Wiley]: That, that's not what I asked.

[Brumfield]: . . . go by my. . .

[Detective Wiley]: What I, what I asked was do you want us to stop now so you can have a lawyer. Is that what I'm hearing?

[Brumfield]:  No.

[Detective Wiley]:  Is that what you're saying . . . .

[Brumfield]:  No, I'm, I'm. . . .

[Detective Wiley]:  Okay.

[Brumfield]:  . . . .that's not what I came here for.

[Detective Wiley]:  So we can continue?

[Brumfield]:  Yeah, I came here to cut . . . [T]o talk. . . . so y'all can . . . get the right understandin[g,] so y'all can go do y'all job.

(State's Exh. Vol. II, pp. 184-85).  Brumfield argues that his statement, "I'd just rather have a lawyer" was a "plain, simple, and straight forward" request and that Detective Wiley did not honor his request for a lawyer, and he improperly engaged in "further discussion to change [his] mind about it."  (State's Exh. Vol. II, p. 184; Appellant's Br. p. 20).  We disagree.

[22]    When Brumfield was asked whether he was going to identify the gang that actually killed T.C., he responded that he was not going to identify the gang and "[he]'d just rather have a lawyer." (State's Exh. Vol. II, p. 184). Brumfield's comment, "I'd just rather have a lawyer" only hinted at a potential desire for an attorney, not a clear and unequivocal request for one.  *See Powell v. State*, 898 N.E.2d 328, 336-37 (Ind. Ct. App. 2008).  Nonetheless, Detective Wiley asked Brumfield no other questions about the case, and he immediately

asked some follow-up questions geared toward clarifying Brumfield's request for an attorney. *See Jackson v. State*, 597 N.E.2d 950, 959 (Ind. 1992) (holding that "[I]f a suspect's request for counsel is perceived to be inherently ambiguous, or equivocal in light of the preceding events, any further questioning should be narrowly limited to clarifying whether the suspect actually wished to have counsel present." (quoting *Sleek,* 499 N.E.2d at 754)). When Brumfield stated that he did not wish to have an attorney, Detective Wiley continued with the questioning. Thus, we conclude that any statements derived after Brumfield's equivocal request for an attorney were properly admitted at his jury trial and were not in violation of his Fifth Amendment right.

[23] The State further argues that even if it had been error, the admission of any subsequent statements made after Brumfield invoked his right to counsel as harmless. We agree. Statements obtained in violation of the federal constitution and erroneously admitted are subject to harmless error analysis. *Storey v. State*, 830 N.E.2d 1011, 1021 (Ind. Ct. App. 2005). We review a claim of federal constitutional error *de novo*, and the error must be harmless beyond a reasonable doubt. *Id*. The State has the burden to demonstrate that the improper admission of a defendant's statement did not contribute to the conviction. *Alford v. State*, 699 N.E.2d 247, 251 (Ind. 1998) (citation and quotation marks omitted). "'To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *Id*.

(quoting *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991)*, disapproved on other grounds by Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). In other words, if the State has presented other overwhelming evidence of the defendant's guilt, then an erroneously admitted statement may be deemed harmless. *Storey*, 830 N.E.2d at 1021.

[24] At no point during the interview did Brumfield admit to killing T.C., rather, Brumfield maintained his theory that a gang was responsible for T.C.'s murder. Brumfield's other statements related to the dynamics of his relationship with T.C. The only possible incriminating statement that Brumfield made at the interview was him confirming his Facebook username as Gunna Hardaway and that he regularly messaged T.C. from that Facebook account. Moreover, we find that Brumfield's confirmation of his Facebook username and use of that account was of no consequence because the record reveals that, two days prior to the interview, Detective Wiley had applied and received a warrant for Brumfield's Facebook account.

[25] Further, the record reveals that Brumfield's statements at the interview were unnecessary for his murder conviction. The State presented evidence that Brumfield argued and threatened to kill T.C. via Facebook Messenger a day before she was murdered; Brumfield's cellphone was traced to the location of the crime scene; and Gavin, an inmate who was confined at around the same time with Brumfield at the county jail, testified that Brumfield professed to him that he fired about twelve shots toward a vehicle occupied by T.C. At the crime scene, the police recovered seventeen bullet casings. Thus, Brumfield's

statements at the interview following his request for an attorney were unnecessary for his murder conviction, and the admission of his statements was harmless at best.

## C. *Indiana Evidence Rule 404(b)*

[26] Brumfield challenges the admission of his Facebook messages to T.C., arguing that he was given insufficient notice that they would be admitted at his jury trial. Indiana Evidence Rule 404(b) provides:

> (1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) *Permitted Uses*; *Notice in a Criminal Case.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:
>
>> (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
>>
>> (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

The purpose of this notice provision is to reduce surprise to the defendant and promote the early resolution of questions of admissibility. *Abdul-Musawwir v. State*, 674 N.E.2d 972, 975 (Ind. Ct. App. 1996), *trans. denied*. The notice

provision is a prerequisite to the admissibility of evidence of a crime, wrong, or other act. *Id*. Failure to comply with the requirements of the rule generally results in the evidence being inadmissible. *Id*.

[27] Brumfield contends that the State failed to provide him with proper pretrial notice of its intent to offer into evidence the death threats he made to T.C. via Facebook Messenger as prior bad acts pursuant to Indiana Evidence Rule 404(b).

[28] The record reveals that the State did not offer its notice of intent to use Brumfield's Facebook messages as evidence of prior bad acts pursuant to Evidence Rule 404(b), nor is there any evidence in the record that Brumfield made a specific discovery request for such information. However, the record reveals that following discovery, Brumfield filed a motion in *limine* seeking to thwart the State from producing his Facebook messages as evidence of his prior bad acts. Ahead of his jury trial, the parties litigated Brumfield's motion in *limine*. The State argued that its lack of pretrial notice should be excused because Brumfield had notice, "a long time ago" since Brumfield's Facebook threats to kill T.C. had been referenced in the probable cause affidavit. (Tr. Vol. II, p. 4). Brumfield's counsel subsequently admitted that inasmuch as there was no formal notice by the State, Brumfield was aware of the State's intention to use Brumfield's Facebook messages as evidence, and that fact prompted him to file the motion in *limine*. Consequently, the trial court denied Brumfield's motion.

[29] Notably, at his trial, Brumfield did not object to the State's presentation of his Facebook messages pursuant to Evidence Rule 404(b), neither did he argue that the State did not provide him with reasonable notice, or argue that he was prejudiced by the State's lack of pretrial notice. Failure to object to the admission of evidence at trial normally results in waiver and precludes appellate review unless its admission constitutes fundamental error. *Whatley v. State*, 908 N.E.2d 276, 280 (Ind. Ct. App. 2009), *trans. denied.* The fundamental error doctrine is extremely narrow. To qualify as fundamental error, the error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. *Willey v. State*, 712 N.E.2d 434, 444-45 (Ind. 1999). To be fundamental error, the error must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process. *Wilson v. State,* 514 N.E.2d 282, 284 (Ind. 1987). In the present case, the State did not offer Brumfield's Facebook death threats to T.C. to show that Brumfield had a propensity to commit murder or that his behavior was in conformity with this character trait. Instead, the State offered the evidence to establish that he had a motive to commit T.C.'s murder, an acceptable use under Rule 404(b)(2). Consequently, we conclude that Brumfield has failed to demonstrate the admission of his Facebook threats to T.C. constituted fundamental error.

## II. *Jury Instruction on Transferred Intent*

[30] The manner of instructing the jury lies within the sound discretion of the trial court and will be reviewed only for an abuse of discretion. *Snell v. State*, 866

N.E.2d 392, 395 (Ind. Ct. App. 2007). In reviewing a trial court's decision to give or refuse tendered jury instructions, the appellate court considers: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether the substance of the tendered instruction is covered by other instructions that are given. *Corbett v. State*, 764 N.E.2d 622, 629 (Ind. 2002).

[31] Over Brumfield's objection, the trial court gave the State's tendered instruction on the doctrine of transferred intent, stating:

> The crime of murder is defined by law as follows: a person who knowingly kills another human being.

> When a person intends to kill another person and instead kills a different person, his intent is transferred from the person to whom it was directed to the person actually killed, and he may be found guilty of murder of the person who was killed.

(Appellant's App. Vol. II, p. 44). Brumfield concedes that the transferred-intent instruction is a correct statement of law and he does not argue that its substance was covered by other instructions. His sole argument is that there was no evidence to support the giving of the instruction.

[32] First, he directs us to Onax's testimony that on the day of the shooting, Onax observed only a woman inside the vehicle and a man with a red hooded sweatshirt holding on to the passenger's side mirror as the vehicle sped off. Brumfield then directs us to other neighbors who testified about the shooting, and he argues that there was conflicting evidence about T.C. being the only

person inside the vehicle. He additionally claims that "none of the other witnesses from the neighborhood said they saw or heard anything other than two (2) people being involved." (Appellant's Br. p. 26). Dismissing the State's claim that there was another person on the scene of the crime, Brumfield contends

> Although [Gavin,] the jail house informant, indicated that Brumfield told him about J-Dot being there, the [S]tate quickly dispelled that argument through Jeramiah Moore's (J-Dot) testimony by showing that J-Dot had been in California from January 14, 2018 through February 1, 2018 and therefore could not have been present at the scene as testified by [] Gavin.

(Appellant's Br. p. 26). He further directs us to the fact that the State impeached J-Dot on the stand through his testimony that he was in California visiting his father from January 14, 2018, through February 1, 2018, therefore implying that J-Dot was not present when T.C. was murdered. As such, Brumfield contends that there was no evidence to support an inference that his intent to kill J-Dot was transferred to T.C. The State posits, "[I]f the jury had accepted Gavin's testimony about Brumfield's statements regarding J-Dot" being present, "it needed to be instructed that Brumfield could still be guilty of T.C.'s murder even if he were trying to kill J-Dot instead." (Appellee's Br. p. 23).

[33] Each party to an action is entitled to have the jury instructed on his particular theory of complaint or defense. *Collins v. Rambo*, 831 N.E.2d 241, 245 (Ind. Ct. App. 2005). Notwithstanding the fact that the State impeached Gavin by

having J-Dot testify that he was in California when T.C.'s murder occurred, Gavin unequivocally testified that Brumfield had informed him that J-Dot was inside the vehicle with T.C. on the day of the shooting; Brumfield was upset with T.C. because she was with J-Dot; Brumfield fired about twelve shots in a vehicle occupied by J-Dot and T.C.; and Brumfield stated that his shots were not intended for T.C.

[34] While there was conflicting evidence as to whether T.C. was the only occupant inside the red vehicle, Gavin's testimony, although weak and inconsistent as compared to J-Dot's testimony, supported the jury instruction on transferred intent. *See Snell*, 866 N.E.2d at 396 (stating that evidence that has some probative value is sufficient to support the giving of an instruction, even if the evidence is weak or inconsistent).

[35] Further, we find that even if it had been error to issue the instruction, it was harmless. "Generally, errors in the giving or refusing of instructions are harmless where a conviction is clearly sustained by the evidence and the jury could not properly have found otherwise." *Matheny v. State*, 983 N.E.2d 672, 681 (Ind. Ct. App. 2013) (quotation omitted), *trans. denied*. We find that any error from giving the instruction was harmless since the State presented strong evidence of Brumfield's guilt: Brumfield's Facebook death threats were strong evidence to prove Brumfield's motive to commit T.C.'s murder; Brumfield's cellphone location placed him at the scene of the crime; Gavin testified that Brumfield informed him that he fired about twelve shots toward a vehicle

occupied by T.C.; and the police recovered seventeen shell casings at the scene of the crime.

[36] Furthermore, we find that the instruction unlikely impacted the jury's verdict. Final Instruction 6B advised the jury that they were the exclusive judges of the evidence, that they were the judges of the credibility of the witnesses and the weight to be given to their testimony, and that they should not disregard the testimony of any witness without due consideration and without just cause, but that they were to decide who to believe and who to disbelieve. Thus, even if it was error to give the transferred intent instruction, the instruction did not assist the jury in its factfinding role. We assume a jury follows the instructions it is given. *See Weisheit v. State*, 26 N.E.3d 3, 20 (Ind. 2015). Therefore, we conclude that the giving of the transferred intent instruction was harmless.

# CONCLUSION

[37] Based on the foregoing, we conclude that the trial court did not abuse its discretion by admitting the statements Brumfield made at the interview, or the Facebook threats he made to T.C. Further, we hold the trial court did not err in giving the transferred intent instruction.

[38] Affirmed.

[39] Baker, J. and Brown, J. concur